UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASSOCIATION OF AMERICAN PHYSICIANS & SURGEONS, INC., <br><br> Plaintiff, <br><br> v. <br><br> EDMUND G. BROWN, JR., in his official capacity as Governor of the State of California, et al., <br><br> Defendants. | No. 2:16-cv-02441-MCE-EFB <br><br><br> **MEMORANDUM AND ORDER** |

By way of this action, Plaintiff "Association of American Physicians and Surgeons, Inc. ('AAPS') seeks declaratory and injunctive relief against Edmund G. Brown, Jr., in his official capacity as Governor of California, and Shelley Rouillard, in her official capacity as the Director of the California Department of Managed Healthcare [('DMHC')]" on the basis that Assembly Bill No. 72 (the "Act" or "AB 72"), which was passed into law on September 23, 2016, violates "multiple constitutional rights of physicians and patients."[1] Pl.'s Compl., ECF No. 1, p. 1, ¶ 1. More specifically, Plaintiff alleges causes of action for violations of the Due Process, Takings, and Equal Protection clauses of both the United States and California constitutions. Defendants answered the Complaint and presently

---

[1] "DMHC is the agency responsible for the execution of the laws of this state relating to health care service plans under the Knox-Keene Health Care Service Plan Act of 1975 ('Knox-Keene Act')." Defs.' Mot., ECF No. 13-1 at 3 (citing Cal. Health & Safety Code §§ 1340, 1341)..

1

before the Court is their subsequent Motion for Judgment on the Pleadings seeking dismissal of all claims.² Hearing on this matter was held before this Court on October 19, 2017, at which time the Court ordered supplemental briefing. That briefing has since been received and has been considered by the Court along with the rest of the record in its entirety. For the following reasons, Defendants' Motion (ECF No. 13) is GRANTED with leave to amend.

## BACKGROUND³

Out-of-network physicians, who are called "noncontracting" physicians by AB 72, do not have the benefits or obligations of being contractually bound with insurance companies. There are both advantages and disadvantages to patients and physicians resulting from an out-of-network status. Some physicians are out-of-network not by choice, but because insurance companies increased their profits by excluding them for reasons other than quality of care. Out-of-network physicians often lack the referral volume of physicians who are within the networks of insurance companies, and, as a result, out-of-network physicians tend to provide more charity care than in-network physicians do. To remain in business, out-of-network physicians may charge more for certain services than the in-network insurance reimbursement rates.

Insured patients, in many cases, obtain policies that require their insurance companies to pay charges submitted by out-of-network physicians, or at least a substantial percentage of those charges. The only meaningful leverage that a physician

---

² Defendants contend in their Motion "that the Eleventh Amendment bar[s] a federal district court from hearing a supplemental state law claim for an injunction against a state officer acting in his official capacity." Defs.' Mot., ECF No. 13-1 at 11 n.2 (citing Pennhurst State School & Hospital v. Halderman, 465 U.S. 89 (1984)); id. at 14 n.3. Plaintiff tacitly concedes this point by arguing in opposition only "that the U.S. Constitution provides virtually identical safeguards and thus Defendants' objection is not an obstacle to Plaintiff's federal claims being allowed in this Court on the same arguments." Pl.'s Opp., ECF No. 14 at 14 n.4. Since Plaintiff properly chose to pursue only their federal claims, those state law causes of action are DISMISSED with leave to amend.

³ Unless otherwise indicated the following facts are taken, for the most part verbatim, from Plaintiff's Complaint.

2

or hospital has in negotiating a contract with an insurance company is the option of the physician or hospital to go out-of-network and not accept the insurance company rates. AB 72 denies the right of a physician to go out-of-network with an insurance company and charge out-of-network rates. Signed into law by the Defendant Governor of California on September 23, 2016, AB 72 adds several new sections to the Health and Safety Code and the Insurance Code to limit the rights of reimbursement for out-of-network physicians.

Specifically, the Act requires the following for out-of-network physicians, effective July 1, 2017:

> [U]nless otherwise agreed to by the noncontracting individual health professional and the plan, the plan shall reimburse the greater of the average contracted rate or 125 percent of the amount Medicare reimburses on a fee-for-service basis for the same or similar services in the general geographic region in which the services were rendered. For the purposes of this section, "average contracted rate" means the average of the contracted commercial rates paid by the health plan or delegated entity for the same or similar services in the geographic region. This subdivision does not apply to subdivision (c) of Section 1371.9 or subdivision (b) of this section.

AB 72 § 2 (adding Section 1371.31 to the Health and Safety Code).

According to Plaintiff, the Act prohibits an out-of-network physician from recovering fully on his or her claims for services lawfully rendered. Specifically, the Act establishes that, beginning with health plans issued on or after July 1, 2017:

> An enrollee shall not owe the noncontracting individual health professional more than the in-network cost-sharing amount for services subject to this section . . . A noncontracting individual health professional shall not bill or collect any amount from the enrollee for services subject to this section except for the in-network cost-sharing amount. . . . If the noncontracting individual health professional has received more than the in-network cost-sharing amount from the enrollee for services subject to this section, the noncontracting individual health professional shall refund any overpayment to the enrollee within 30 calendar days after receiving payment from the enrollee.

AB 72 § 3 (adding Section 1371.9 to the Health and Safety Code). This ban in the Act on collecting from enrollees purportedly has the effect of preventing out-of-network physicians from recovering their fees from the insurance carriers that cover the enrollees for services rendered.[4]

In addition, the Act requires the Department, by September 1, 2017, to "establish an independent dispute resolution process for the purpose of processing and resolving a claim dispute between a health care service plan and a noncontracting individual health professional for services" rendered. AB 72 § 1 (adding Section 1371.30 to the Health and Safety Code). Out-of-network physicians are thereby required to participate in this alternative dispute resolution on their claims, rather than immediately pursue their remedies in court.

In their instant Motion, Defendants emphasize, however, that a health care service plan and out-of-network provider are permitted to "agree on a reimbursement rate." Defs.' Mot. at 5. Only if no agreement is reached does AB 72 require plans to reimburse relevant providers at no less than the statutory default rate. Moreover, to calculate that rate,

> AB 72 requires each health plan, and its delegated entities, to provide to DMHC all of the following information for the 2015 calendar year: (1) data listing average contracted rate for services most frequently provided in or resulting from services provided in contracted facilities by out-of-network providers in each geographic region in which the services are rendered; (2) its methodology for determining these rates, including the highest and lowest contracted rates; and (3) its policies and procedures used to determine the average contracted rates.

Id. Defendants further stress as to the dispute resolution procedures that if dissatisfied with the results of arbitration, "either party may pursue any right, remedy, or penalty established under any other applicable law." Defs.' Mot. at 6 (quoting Cal. Health & Safety Code § 1371.30(d)).

///

---

[4] The Act generally exempts medical services rendered on an emergency basis, but does not expressly exempt services rendered on a quasi-emergency basis, such as after a patient has been transferred from an emergency room to an intensive-care unit (ICU).

4

Upon implementation of the Act, Plaintiff initiated this Action facially challenging both the reimbursement rates and the compulsory arbitration provisions. Defendants answered the Complaint and have now moved for Judgment on the Pleadings.

**STANDARD**

Under Rule 12(c), "a party may move for judgment on the pleadings" after the pleadings are closed "but early enough not to delay trial." A motion for judgment on the pleadings pursuant to Rule 12(c) "challenges the legal sufficiency of the opposing party's pleadings." See, e.g., Westlands Water Dist. v. Bureau of Reclamation, 805 F. Supp. 1503, 1506 (E.D. Cal. 1992).

A motion for judgment on the pleadings should only be granted if "the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1550 (9th Cir. 1989). In reviewing a Rule 12(c) motion, "all factual allegations in the complaint [must be accepted] as true and construe[d] . . . in the light most favorable to the non-moving party." Fleming v. Pickard, 581 F.3d 922, 925 (9th Cir. 2009). Judgment on the pleadings under Rule 12(c) is warranted "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Deveraturda v. Globe Aviation Sec. Servs., 454 F.3d 1043, 1046 (9th Cir. 2006) (internal citations omitted).

Although Rule 12(c) does not mention leave to amend, courts have the discretion in appropriate cases to grant a Rule 12(c) motion with leave to amend, or to simply grant dismissal of the action instead of entry of judgment. See Lonberg v. City of Riverside, 300 F. Supp. 2d 942, 945 (C.D. Cal. 2004); Carmen v. S.F. Unified Sch. Dist., 982 F. Supp. 1396, 1401 (N.D. Cal. 1997). Leave to amend should be "freely given" where there is no "undue delay, bad faith or dilatory motive on the part of the movant, . .

5

. undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment . . . ." Foman v. Davis, 371 U.S. 178, 182 (1962); Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003) (listing the Foman factors as those to be considered when deciding whether to grant leave to amend). Not all of these factors merit equal weight. Rather, "the consideration of prejudice to the opposing party . . . carries the greatest weight." Eminence Capital, 316 F.3d at 1052 (citing DCD Programs, Ltd. v. Leighton, 833 F.2d 183, 185 (9th Cir. 1987)). Dismissal without leave to amend is proper only if it is clear that "the complaint could not be saved by any amendment." Intri-Plex Techs. v. Crest Group, Inc., 499 F.3d 1048, 1056 (9th Cir. 2007) (citing In re Daou Sys., Inc., 411 F.3d 1006, 1013 (9th Cir. 2005).

**ANALYSIS**

Plaintiff's Complaint is hereby DISMISSED because: (1) the claims against the Governor are barred as joined in violation of the Eleventh Amendment; (2) Plaintiff failed to adequately allege it has standing to pursue its claims; and (3) regardless, Plaintiff failed to state a claim that the Act is facially invalid under any of its theories.

**A.  The Governor Has Been Joined In Contravention Of The Eleventh Amendment.**

According to Plaintiff's Complaint, Defendant Brown was joined as "the chief executive of California having the ultimate responsibility for enforcing AB 72." Pl.'s Compl. ¶ 9. Defendants contend otherwise, arguing that "the Governor has no direct connection to the enforcement of the Health and Safety Code provisions at issue in this litigation." Defs.' Mot. at 8. Consequently, according to Defendants, there is no adequate "connection between the official sued and enforcement of the allegedly unconstitutional statute . . . ." Id. (quoting Long v. Van de Camp, 961 F.2d 151, 152 (9th Cir. 1992). At the hearing before this Court, Plaintiff conceded that dismissing the Governor was proper. The Court agrees. See Ex Parte Young, 209 U.S. 123, 155-56

(1908) ("[I]ndividuals who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action."). Under this doctrine, as alleged, the Governor is simply too attenuated as an actor to be considered to have enforcement duties with regard to AB 72. As such, Defendants' Motion is GRANTED on this ground.

### B. Plaintiff Has Not Adequately Alleged The Requisite Standing To Pursue Its Claims.

Plaintiff purports to allege standing on behalf of two different groups. First, it contends that its "members, including California ophthalmologist Michael Couris, M.D., suffer imminent threatened injury . . . , including financial harm, as a result of the enactment and upcoming enforcement of the Act." Pl.'s Compl. ¶ 14. "In addition, with respect to the Equal Protection claims . . . , the patients of AAPS members suffer imminent threatened injury in the form of reduced availability for medical care to them." Id. Defendants counter that Plaintiff has failed to allege associational standing on behalf of its members because its allegations of potential harm are speculative and, regardless, there is no obstacle to Plaintiff's members suing themselves if a billing issue arises in the future. Defs.' Mot at 9-10. In addition, Defendants contend Plaintiff has met none of the requisites to warrant finding third-party standing appropriate. Defendants' arguments are the more persuasive, and Plaintiff's Complaint is DISMISSED with leave to amend for lack of standing.

#### 1. Associational Standing

"[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and 3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Friends of the Earth, Inc. v.

Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 180-81 (2000). "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Id.

According to Defendants:

> Conspicuously missing from the complaint are allegations that the physician-members, who are out-of-network providers, (1) will not be reasonably reimbursed for their services (either through the Act's reimbursement methodology or the dispute resolution process), or (2) will be forced to abandon their practices and/or become in-network providers. Any harm on the physician-members is based on what may happen in the future if at some point in time an out-of-network physician is ultimately denied reasonable reimbursement under this very narrow application of the Act.

Defs.' Mot. at 10. Defendants take the position that absent such allegations, the harms alleged are merely "hypothetical" or "speculative" and thus are insufficient to justify standing. Id. Although it is very possible, and in the Court's opinion possibly even likely, that some of Plaintiff's members will eventually be adversely affected when the Act is applied to them, based on the current allegations at least, that possibility is still speculative at best. For example, for Plaintiff's members to suffer harm, the following must first bear out: "(1) the inability of out-of-network providers to reach agreements for reasonable compensation with health care service plans; (2) the setting of unreasonable rates of reimbursement; and (3) unsuccessful appeals pursuant to AB 72's independent dispute resolution process." Def. Reply, ECF No. 24, at 4. Given those conditions precedent to any actual injury, Plaintiff has failed to allege it has standing to pursue these claims on behalf of its members. See Coons v. Lew, 762 F.3d 891, 897-98 (9th Cir. 2014).

///

///

///

8

### 2. Third-party standing

"In the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." <u>Powers v. Ohio</u>, 499 U.S. 400, 410 (1991). "This fundamental restriction on our authority admits of certain, limited exceptions." <u>Id.</u>

> [Courts] have recognized the right of litigants to bring actions on behalf of third parties, provided three important criteria are satisfied: The litigant must have suffered an "injury in fact," thus giving him or her a "sufficiently concrete interest" in the outcome of the issue in dispute; the litigant must have a close relation to the third party, and there must exist some hindrance to the third party's ability to protect his or her own interests.

<u>Id.</u> at 410-11. For reasons that this case makes clear, third-party standing is more difficult to allege than associational standing.

Plaintiff is attempting to assert claims belonging not to third parties with which it has a relationship, but to third parties with whom its members purportedly have relationships. More specifically, Plaintiff asserts its equal protection claim on behalf of those patients who receive charity care from out-of-network physicians in underserved and minority communities. While Plaintiff's members might be able to make the requisite showing that they have relationships with particular third-party patients and that they have themselves been harmed by the Act, Plaintiff is simply not in a position to allege the same. Nor does there appear to be any obstacle to the ability of the third-party patients to protect their own interests. Since Plaintiff has failed to allege the requisite preconditions to justify third-party standing, the Equal Protection claim fails on this basis as well.

### C. Even If Plaintiff Had Standing, Its Claims, As Currently Pled Nonetheless Fail On The Merits

#### 1. Facial Challenges

As a threshold matter, the standard for bringing a facial challenge to a statute is critical, and in this case essentially dispositive of Plaintiff's claims. The Supreme Court has explained:

Under United States v. Salerno, 481 U.S. 739 (1987), a plaintiff can only succeed in a facial challenge by "establish[ing] that no set of circumstances exists under which the Act would be valid," i.e., that the law is unconstitutional in all of its applications. Id., at 745. While some Members of the Court have criticized the Salerno formulation, all agree that a facial challenge must fail where the statute has a "'plainly legitimate sweep.'" Washington v. Glucksberg, 521 U.S. 702, 739–740, and n. 7 (1997) (STEVENS, J., concurring in judgments) . . . . In determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial requirements and speculate about "hypothetical" or "imaginary" cases. See United States v. Raines, 362 U.S. 17, 22 (1960) ("The delicate power of pronouncing an Act of Congress unconstitutional is not to be exercised with reference to hypothetical cases thus imagined"). The State has had no opportunity to implement [the challenged law], and its courts have had no occasion to construe the law in the context of actual disputes arising [in] context, or to accord the law a limiting construction to avoid constitutional questions. Cf. Yazoo & Mississippi Valley R. Co. v. Jackson Vinegar Co., 226 U.S. 217, 220 (1912) ("How the state court may apply [a statute] to other cases, whether its general words may be treated as more or less restrained, and how far parts of it may be sustained if others fail are matters upon which we need not speculate now"). Exercising judicial restraint in a facial challenge "frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy." Raines, supra, at 22, 80 S. Ct. 519.

Facial challenges are disfavored for several reasons. Claims of facial invalidity often rest on speculation. As a consequence, they raise the risk of "premature interpretation of statutes on the basis of factually barebones records." Sabri v. United States, 541 U.S. 600, 609 (2004) (internal quotation marks and brackets omitted). Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither "'anticipate a question of constitutional law in advance of the necessity of deciding it'" nor "'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'" Ashwander v. TVA, 297 U.S. 288, 346–347 (1936) (Brandeis, J., concurring) (quoting Liverpool, New York & Philadelphia S.S. Co. v. Commissioners of Emigration, 113 U.S. 33, 39 (1885)). Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution. We must keep in mind that "'[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.'" Ayotte v. Planned Parenthood of Northern New Eng., 546 U.S. 320, 329 (quoting Regan v. Time, Inc., 468 U.S. 641, 652 (1984) (plurality opinion)).

Washington State Grange v. Washington State Republican Party, 552 U.S. 442, 449-51 (2008) (footnote omitted).

There are aspects of the Act that appear troubling at this early stage. For example, although the default rate provisions seem to leave open the possibility that out-of-network doctors will be able to negotiate higher rates, from a practical perspective, it seems more likely that in practice those rates will end up acting as a ceiling rather than a floor. To the extent that occurs, Plaintiff may be able to successfully pursue an as applied challenged based on its current position that those rates are confiscatory. That said, because it is entirely possible that reimbursement rates will actually be higher than the default rates, the Act's provisions are simply not amenable to a facial challenge.

This makes more sense if the instant challenge is compared to other facial challenges this Court has entertained. In Sassman v. Brown, No. 14cv1679-MCE-KJN, for example, this Court considered a challenge to California's Alternative Custody Program that was open only to qualifying female inmates. A facial challenge was appropriate based on plaintiff's theory that the statute could never be constitutionally applied as written given that it excluded all men solely based on their gender. Likewise, in ProtectMarriage.com v. Bowen, No. 09-cv-00058-MCE-DAD, this Court heard argument that a $100 threshold for reporting campaign contributors was unconstitutional in every application across the board. Although the Court eventually rejected that argument, it was properly entertained as a facial attack because the plaintiffs' argument left open no possibility for constitutional application.

In this case, on the other hand, Plaintiff's arguments turn on how the statute will potentially be applied to individual physicians. Whether the rates are confiscatory turns on whether the insurance companies will actually negotiate with out-of-network physicians, whether the arbitration provisions are effective, and whether physicians ultimately pursue remedies in court. Given the uncertainty as to how these eventualities might play out, and the fact that the results under the act may differ from physician to

///

physician, a facial challenge to the Act is inappropriate, and the Complaint is DISMISSED on this basis as well, although the Court offers further explanation below.

### 2. Equal Protection

According to Plaintiff, "[m]any out-of-network physicians, including members of Plaintiff AAPS, depend on their ability to bill market rates for their services to insured patients in order to be able to offer charity or undercompensated care to underserved minority patients." Pl.'s Comp. ¶ 44. Moreover, "[u]nderserved minority patients depend on the continued availability of medical care from these out-of-network physicians, including members of . . . AAPS." Id. ¶ 45. Unfortunately, Plaintiff contends, "[t]he Act will force out-of-network physicians, including members of AAPS, out of business or into insurance networks that render it infeasible to provide substantial amounts of care to underserved, uninsured, predominantly minority patients." Id. ¶ 46. Such patients thus "face imminent harm, in the form of lost access to out-of-network physicians and decreased availability to medical care." Id. ¶ 47. Defendants seek dismissal of this cause of action on grounds that Plaintiff has failed to adequately identify a particular class, that any purported injury sought to be redressed by this claim is speculative, and that the claim fails rational basis review in any event.

Plaintiff's attempt to identify a protected class that is being treated differently than another similarly situated class misses the mark. If the class Plaintiff seeks to protect is uninsured patients who count on free or discounted treatment from out-of-network physicians, then those individuals are not similarly situated to any other identified class (e.g., the insured individuals directly affected by the Act). To the extent Plaintiff means to identify a class of "underserved, minority patients," its argument is similarly unpersuasive. Plaintiff has failed to allege any facts indicting that the Act treats minority patients any differently than non-minority patients or that its passage was driven by any discriminatory intent.

Moreover, given the lack of suspect classification, the Act is only subject to rational basis review. According to Defendants:

> The Act reasonably supports the government's interest in protecting the financial interests of California patients, health plans, and physicians alike. AB 72 protects patients from surprise medical bills when they follow the rules of their health plan. Patients would be responsible only for their in-network cost sharing and would be prevented from receiving out-of-network bills from physicians that they did not choose. The Act also keeps California's health care costs under control. The Act also provides certainty for physicians and health plans because physicians must be reimbursed a fair rate for their services.

Defs.' Mot. at 14. Given the State's identified interests, even if Plaintiff standing, its Equal Protection claim would not withstand review.

### 3. Due Process

According to Plaintiff, "AB 72 violates the Due Process Clause of the U.S. Constitution by delegating rate-setting authority to private companies, with respect to physicians who are not under any contract with the health care service plan providers, and by requiring arbitration for out-of-network physicians on their disputed reimbursement claims, thereby denying them their due process rights in court on their claims." Pl. Opp. at 2. Substantively, Plaintiff alleges that "[t]he price-setting by insurance companies under the Act with respect to out-of-network physicians imposes <u>confiscatory</u> rates in violation of this Due Process Clause." Pl.'s Compl. ¶ 29. Procedurally, Plaintiff asserts that the Act is unconstitutional to the extent it requires "out-of-network physicians, including members of AAPS, to participate in arbitration rather than pursue their claims in court." Id. ¶ 30. Accordingly, Plaintiff contends that "[t]he Act improperly shifts the burden onto physicians to challenge the price controls, and the Act denies them their due process rights to do so. Id. ¶ 31.

Defendants, on the other hand, argue that "regardless of how the issues are framed in the complaint, at bottom, neither the default reimbursement rate nor the independent dispute resolution process is binding on providers because they can always seek judicial review of a specific reimbursement claim. Defs.' Mot. at 14. Defendants further contend that the Act is reasonably related to the legislature's purposes and is neither arbitrary nor discriminatory in any event. Id. at 15. Defendants similarly argue

that the dispute resolution provisions are consistent with procedural due process guarantees. Id. at 17. Ultimately, though, the Court need not get too far into the weeds of the parties' arguments because none of Plaintiff's contentions are viable to support a facial challenge to the Act.

### a. Substantive Due Process

Substantive due process "forbids the government from depriving a person of life, liberty, or property in such a way that 'shocks the conscience' or 'interferes with rights implicit in the concept of ordered liberty.'" Nunez v. City of Los Angeles, 147 F.3d 867, 871 (9th Cir.1998) (citations omitted). To establish a violation of substantive due process, Plaintiff must demonstrate that the government's action was "clearly arbitrary and unreasonable, having no substantial relation to public health, safety, morals, or general welfare." Wedges/Ledges of Cal., Inc. v. City of Phoenix, 24 F.3d 56, 65 (9th Cir. 1994) (citations and internal quotation marks omitted). There is no dispute that Plaintiff's members have a property interest in the income derived from their medical practices. Defendants argue instead that that the State's actions were not arbitrary and capricious.

More specifically, Defendants contend that "[s]ubstantive due process is served because the Act provides multiple ways by which out-of-network providers can be reasonably reimbursed for their services, including an agreed upon rate between the provider and health plan, and a default rate based on geographical areas." Defs.' Mot. at 3. According to Defendants, the Act is neither arbitrary nor discriminatory in that: (1) "[it] only applies in limited situations"; (2) "[t]he reimbursement rates are flexible"; (3) "[t]he reimbursement rates are not confiscatory"; and (4) "[t]he Act satisfies the rational basis standard." Defs. Mot. at 15-17. Plaintiff, of course, disagrees with each of those assertions.

The viability of Plaintiff's claim thus hinges on the Court accepting its interpretation of just how the provisions of the Act will affect out-of-network physicians. Specifically, Plaintiff contends that the reimbursement rates are so unconstitutionally low

14

that they should be considered confiscatory. Plaintiff thus argues that the Act imposes a price ceiling that is both arbitrary and unreasonable.

The problem with Plaintiff's argument is that, as already indicated, while Plaintiff's assertions may eventually prove correct once the Act is actually applied to certain physicians, it does not, by its terms, impose a mandatory rate that this Court can determine is confiscatory in <u>every</u> application. To the contrary, a plain reading of the statute indicates that the Act imposes only a floor, or a minimum rate that physicians subject to the Act can expect to recover. This provision is thus directly related to the State's interests in controlling health care costs and providing certainty as to reimbursement rates, which is all that is required to overcome rational basis review. Accordingly, while it may be that in application physicians will face an uphill battle in persuading insurance companies to depart from the default rates, Plaintiff has not pled that the challenged provision will be arbitrary and discriminatory in all applications. Indeed, Plaintiff cannot feasibly make such an argument here when not even a "barebones" record has been developed.[5]

### b. Procedural Due Process

Defendants next contend that dismissal of Plaintiff's procedural claim is warranted because despite requiring physicians to essentially exhaust administrative remedies, a judicial remedy always remains available. Defs.' Mot. at 18. According to Defendants, the only way "to find the IDRP provision unconstitutional" would be "to delete the provision that provides for judicial review." <u>Id.</u> Moreover, Defendants contend that "[c]ourts have held that statutes which require participation in arbitration (like the Act) are constitutional as long as subsequent court review is permitted." Defs.' Reply at 9. Plaintiff counters, however, that "[p]iecemeal, time-consuming arbitration over individual fees is not an adequate remedy for relief from across-the-board confiscatory

---

[5] Plaintiff appears to attempt to remedy this by arguing that the Act impermissibly delegates rate-setting authority to private entities (insurance companies). That assertion runs contrary to the plain language of the Act, which provides objective means (even if based in part on rates insurers pay to their contracted doctors) to determine default rates and still allows for judicial review regarding reasonableness.

rates" and that "[s]imilar mandatory arbitration provisions have been stricken by courts." Pl.'s Opp. at 17.

To the extent Plaintiff's current argument turns on the Court finding that the rates are confiscatory in all applications, this claim fails for the same reasons articulated above. This claim is just as speculative, however, to the extent it is instead based on Plaintiff's prognosis for how the compulsory arbitration provisions will affect physicians, its assumption that it will affect all physicians in the same way and to the same extent, and its conclusion, contrary to Defendants' assertions, that judicial review has not been preserved. Because there is no record before the Court as to how these provisions will apply in practice, it would be premature to address Plaintiff's claim facially rather than through an as applied challenge. Indeed, there may well be instances in which the arbitration provisions provide for a more cost-effective and timely resolution of a physician's dispute with an insurance company. Accordingly, because Plaintiff has not alleged that the Act will violate physicians' procedural due process rights in all of its applications, this claim is also DISMISSED with leave to amend.

### 4. Takings

Finally, Plaintiff contends that "[b]y forbidding out-of-network physicians from collecting by suing on their claims for services rendered, the Act deprives them of their property interests in reimbursements, without just compensation, in violation of the Takings Clause of the Fifth Amendment . . . ." Pl.'s Compl. ¶ 36. Moreover, "[t]he rate mechanism imposed by the Act constitutes <u>confiscatory</u> wage controls on physicians, thereby depriving them of their property rights for their labor, without just compensation, which further violates this Takings Clause." Id. ¶ 37. "In addition, the Act violates this Takings Clause by transferring property from one private group (physicians) to other private entities, namely insurance companies, in the form of the latter's underpayment for services." Id. ¶ 38. Finally, "[b]y compelling out-of-network physicians to participate in arbitration as required by the Act, Plaintiff's members are further deprived of just compensation for the services that they rendered." Id. ¶ 39.

Defendants disagree, contending that:

> The provisions of the Act do not result in the level of economic impact necessary to find a takings violation. As previously discussed, the Act's reimbursement provisions are not confiscatory or even mandatory. Rather, the out-of-network provider has a number of ways to recover reasonable reimbursement for their services, including contracting with the health plans or accepting an average contract rate established by a methodology that takes into account the health provider's specialty and the geographic region where the services were provided. Id. § 1371.31(a)(3)(A). While recovery from patients who receive an unexpected bill for services may be, at the outset, uncertain, the Act provides the health provider with a guaranteed reasonable reimbursement payment, consistent with what a health provider should reasonably expect for the provided services. The Act's provisions, properly adjusting the burdens of healthcare costs and preventing the surprise billing of patients, is the type of governmental action that does not lend itself to a finding of unlawful taking.

Defs.' Mot. at 19-20.

Resolution of the takings dispute, then, like the substantive due process dispute, comes down to whether the Act imposes rates that are confiscatory and mandatory. Because Plaintiff has not pled that will be the result in all applications, this facial claim is DISMISSED as well.

## CONCLUSION

For the reasons just stated, Defendants' Motion for Judgment on the Pleadings (ECF No. 13) is GRANTED with leave to amend. Plaintiff may, but is not required to, file an amended complaint not later than thirty (30) days following the date this Memorandum and Order is electronically filed. If no amended complaint is timely filed, this action will be deemed dismissed with prejudice upon no further notice to the parties.

IT IS SO ORDERED.

Dated: March 28, 2018

_____
MORRISON C. ENGLAND, JR
UNITED STATES DISTRICT JUDGE

17