1   XAVIER BECERRA, State Bar No. 118517
    Attorney General of California
2   NIROMI W. PFEIFFER, State Bar No. 154216
    Supervising Deputy Attorney General
3   DARRELL W. SPENCE, State Bar No. 248011
    Deputy Attorney General
4     1300 I Street, Suite 125
      P.O. Box 944255
5     Sacramento, CA 94244-2550
      Telephone: (916) 210-6089
6     Fax: (916) 324-5567
      E-mail:  Darrell.Spence@doj.ca.gov
7   *Attorneys for Defendant Department of Managed
    Health Care*

8

IN THE UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11

12

| | |
|---|---|
| 13  **ASSOCIATION OF AMERICAN PHYSICIANS & SURGEONS, INC., and** | 2:16-cv-02441 MCE-EFB |
| 14  **EILEEN NATUZZI, M.D.,** | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF** |
| 15  Plaintiffs, | **MOTION TO DISMISS** |
| 16  **v.** | Date:        September 6, 2018 |
| 17  | Time:        2:00 p.m. |
| 18  **SHELLEY ROUILLARD, in her official capacity as the Director of the California** | Courtroom:  7<br>Judge:        Hon. Morrison C. England, Jr.<br>Trial Date:   None Set |
| 19  **Department of Managed Health Care,** | Action Filed: October 13, 2016 |
| 20  Defendant. | |

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................................. 1

Summary of the Amended Complaint ....................................................................... 3

Summary of the Relevant Provisions of AB 72 ........................................................ 4

    I.      Patient Protections ........................................................................................ 4

    II.     Required Provider Reimbursement ............................................................. 5

    III.    Prompt Resolution of Disputed Claims ...................................................... 6

         A.     Health Plan's Internal Dispute Resolution Process ..................... 6

         B.     The IDRP Process ......................................................................... 7

         C.     IDRP Fees ..................................................................................... 8

Standard of Review .................................................................................................... 8

    I.      Standards for a Motion to Dismiss ............................................................. 8

    II.     Standards for a Facial Challenge ................................................................ 9

         A.     The Instant Action is a Facial Challenge to the Act ................... 9

         B.     Facial Challenges Are Disfavored ............................................. 10

Argument ................................................................................................................. 11

    I.      Plaintiffs Do Not Have Standing to Bring This Action ......................... 11

         A.     AAPS Lacks Associational Standing Because any Harm to its Members is Speculative ............................................................. 11

         B.     Dr. Natuzzi Lacks Standing Because She Has Not Been Precluded from Receiving Private Payments from Medicare-Enrolled Patients, and Has Not Availed Herself of the Act's Remedies for Reimbursement ......................................................................... 13

    II.     Even if Plaintiffs Had Standing, They Cannot Allege a Violation of their Constitutional Rights ................................................................................. 14

         A.     The Act Does Not Violate the Due Process Clause of the U.S. Constitution ............................................................................... 14

         B.     The Act Does Not Violate the Takings Clause of the U.S. Constitution ............................................................................... 17

         C.     Plaintiffs are Barred from Bringing a Cause of Action Under the Supremacy Clause of the U.S. Constitution ............................. 19

Conclusion ............................................................................................................... 20

i

# TABLE OF AUTHORITIES

**Page**

C ASES

*Ashcroft v. Iqbal*
  556 U.S. 662 (2009) ..........................................................................................9

*Bell Atl. Corp. v. Twombly*
  550 U.S. 544 (2007) ..........................................................................................9

*Bell v. Blue Cross of California*
  131 Cal.App.4th 211 (2005) ..................................................................15, 19

*Board of Regents v. Roth*
  408 U.S. 564 (1971) ........................................................................................15

*Coons v. Lew*
  762 F.3d 891 (9th Cir. 2014) ........................................................................12, 14

*Feldman v. Arizona Sec'y of State's Office*
  843 F.3d 366 (9th Cir. 2016) ..........................................................................10

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*
  528 U.S. 167 (2000) ........................................................................................11

*Hardware Dealers' Mut. Fire Ins. Co. of Wis. v. Glidden Co.*
  284 U.S. 151 (1931) ........................................................................................16

*Hoopa Valley Tribe v. Christie*
  812 F.2d 1097 (9th Cir. 1987) ........................................................................15

*Hudson v. Palmer*
  468 U.S. 517 (1984) ........................................................................................12

*In re De Laurentiis Entm't Grp. Inc.*
  963 F.2d 1269 (9th Cir. 1992) ..................................................................15, 19

*Intri-Plex Techs., Inc. v. Crest Grp., Inc.*
  499 F.3d 1048 (9th Cir. 2007) ........................................................................9

*Jama Constr. v. City of Los Angeles*
  938 F.2d 1045 (9th Cir. 1991) ........................................................................19

*John Doe No. 1 v. Reed*
  561 U.S. 186 (2010) ........................................................................................9

*Lee v. City of Los Angeles*
  250 F.3d 668 (9th Cir. 2001) ..........................................................................9

ii

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Lucero v. Hart*
   915 F.2d 1367 (9th Cir. 1990)....................................................................................15

*Lujan v. G & G Fire Sprinklers, Inc.*
   532 U.S. 189 (2001) ............................................................................................16, 17

*Lyeth v. Chrysler Corp.*
   929 F.2d 891 (2d Cir. 1991)...............................................................................16, 17

*Orloff v. Cleland*
   708 F.2d 372 (9th Cir. 1983).....................................................................................16

*Peick v. Pension Ben. Guar. Corp.*
   724 F.2d 1247 (7th Cir. 1983)...................................................................................17

*Peterson v. United States Dept. of Interior*
   899 F.2d 799 (9th Cir. 1990).....................................................................................15

*Prospect Medical Group, Inc. v. Northridge Emergency Medical Group*
   45 Cal.4th 497 (2009) ................................................................................................4

*Schmier v. U.S. Court of Appeals for Ninth Circuit*
   279 F.3d 817 (9th Cir. 2002).....................................................................................13

*Sierra Med. Servs. All. v. Kent*
   883 F.3d 1216 (9th Cir. 2018)............................................................................15, 19

*Southern Pacific Transp. Co. v. City of Los Angeles*
   922 F.2d 498 (9th Cir. 1990).....................................................................................19

*United States v. Raines*
   362 U.S. 17 (1960) ....................................................................................................10

*United States v. Ritchie*
   342 F.3d 903 (9th Cir. 2003).......................................................................................9

*United States v. Salerno*
   481 U.S. 739 (1987) ..................................................................................................10

*Washington State Grange v. Washington State Republican Party*
   552 U.S. 442 (2008) ............................................................................................11, 17

*Washington v. Glucksberg*
   521 U.S. 702 (1997) ..................................................................................................10

### TABLE OF AUTHORITIES
#### (continued)

**Page**

*Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*
    473 U.S. 172 (1985) ...........................................................................................12, 17, 18

**STATUTES**

United States Code, Title 42
    § 1395a ...........................................................................................................................4
    § 1983 .............................................................................................................................3

California Health and Safety Code
    § 1340 .............................................................................................................................3
    § 1341 .............................................................................................................................3
    § 1371.30(b)(1) ..............................................................................................................6
    § 1371.30(b)(2) ..............................................................................................................8
    § 1371.30(b)(3) ..............................................................................................................8
    § 1371.30(d) .......................................................................................................8, 15, 18
    § 1371.31(a)(1) ..............................................................................................................5
    § 1371.31(a)(2)(A)(i) .....................................................................................................6
    § 1371.31(a)(2)(A)(ii) ....................................................................................................6
    § 1371.31(a)(2)(A)(iii) ...................................................................................................6
    § 1371.31(a)(2)(B) .........................................................................................................6
    § 1371.31(a)(3)(A) .........................................................................................................6
    § 1371.31(a)(5) ..............................................................................................................5
    § 1371.31(e)(f) ...............................................................................................................5
    § 1371.9 ..........................................................................................................................6
    § 1371.9(a)(1) ................................................................................................................4
    § 1371.9(a)(3) ................................................................................................................4
    § 1371.9(c) .....................................................................................................................4
    § 1371.9(c)(1)-(6) ..........................................................................................................5
    § 1371.9(g) .....................................................................................................................5
    § 1371.9(j)(k) .................................................................................................................5
    § 1371.9(j)(k) ...............................................................................................................14
    § 1371.30(a)(1) ..............................................................................................................6
    § 1371.30(a)(2) ..............................................................................................................6
    § 1371.30(a)(3) ..............................................................................................................7

**CONSTITUTIONAL PROVISIONS**

U.S. Constitution
    14th Amendment , § 1 ..................................................................................................14

**COURT RULES**

Federal Rule of Civil Procedure 12(b)(6) ...........................................................................9

iv

1

## TABLE OF AUTHORITIES
### (continued)

2
**Page**

3

**OTHER AUTHORITIES**

4

California Code of Regulations, Title 28
§ 1300.71(a)(3)(B)(i)-(vi) .......................................................................................7
§ 1300.71.38(f)..........................................................................................................6

Merlow M. Dunham, *Avoiding Sticker Shock: Legislative Approaches to Protect Consumers from Surprise Medical Bills* ..................................................................1

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

The purpose of Assembly Bill 72 ("AB 72" or the "Act") is to protect patients who have health coverage from "surprise medical bills."  These are bills received by patients for treatment that is rendered by an out-of-network health professional and accompanies or results from treatment at an in-network health facility.  Importantly, the Act also ensures that out-of-network health care providers are reasonably reimbursed for their services by either an agreed upon rate or a default payment rate based, in part, on geographical region.  But a provider has a remedy if an agreement for reimbursement cannot be reached with a health service care plan, and the provider is dissatisfied with the default rate: the Act creates an independent dispute resolution process that gives out-of-network providers the option to resolve their disputes with health care service plans short of formal litigation.  If the provider is dissatisfied with the result obtained through the independent dispute resolution process, the provider may seek redress in court.  These features of the Act serve the goals of keeping California's health care costs under control, and providing certainty for providers and health care service plans regarding fair rates of compensation for health care services.[1]

Plaintiffs, however, assert that the Act is unconstitutional, and seek declaratory and injunctive relief prohibiting the implementation of the Act on three different grounds.  First, Plaintiffs allege that the Act's independent dispute resolution process is cost-prohibitive for providers in terms of time and fees, in violation of the Due Process Clause of the U.S. Constitution.  Second, Plaintiffs allege that the Act violates the Takings Clause of the U.S. Constitution by causing a sharp, unreasonable decline of 25% in payments to out-of-network physicians for services rendered.[2]  Finally, Plaintiffs allege that AB 72 prohibits out-of-network providers from collecting for their services rendered to Medicare beneficiaries, in violation of the Supremacy Clause of the U.S. Constitution.  Plaintiffs' claims fail for the following reasons.

---

[1] Other states, including Florida, New York, and Colorado, have enacted similar legislation to protect consumers from surprise medical billing.  (Merlow M. Dunham, *Avoiding Sticker Shock: Legislative Approaches to Protect Consumers from Surprise Medical Bills*, 11 St. Louis U.J. Health L. & Pol'y 179, 200 (2017).)

[2] The amended complaint does not contain allegations explaining exactly how the Act caused AAPS' members' and Dr. Natuzzi's reimbursements to decline by 25%.

1

1    First, as to Plaintiff Association of American Physicians & Surgeons, Inc. ("AAPS"), the

2  amended complaint fails to sufficiently allege standing to bring this action on behalf of AAPS'

3  members.  AAPS generally claims that as a physician-based organization it automatically has

4  standing to represent its members who are out-of-network providers who are subject to the Act's

5  reimbursement and dispute resolution provisions.  However, any harm to a physician-member is

6  based on what *may* happen in the future *if* at some point in time an out-of-network physician is

7  ultimately denied reasonable reimbursement after completion of the Act's reimbursement process.

8  Since none of AAPS' members have met these conditions precedent to any actual injury, AAPS

9  has failed to allege it has standing to pursue these claims on behalf of its members.

10    Second, as to Plaintiff Eileen Natuzzi, M.D. ("Dr. Natuzzi"), she similarly lacks standing to

11  bring her claims.  For Dr. Natuzzi to suffer harm, and thus, have standing to bring her claims, the

12  following must first bear out: (1) she must be unable to reach an agreement for reasonable

13  compensation with a health care service plan; (2) an unreasonable default rate for her

14  reimbursement must be set; and (3) she must unsuccessfully appeal the default rate pursuant to

15  the Act's independent dispute resolution process.  The amended complaint lacks any allegations

16  concerning these conditions precedent to actual injury.

17    Third, Plaintiffs' claim that the Act's process for challenging underpayment violates the

18  Due Process Clause must be rejected, since the process is not unduly costly or lengthy, and the

19  process is fair.  Moreover, because the Act authorizes Plaintiffs to file a lawsuit in state court if

20  they are unsatisfied with the administrative remedies under the Act, due process is satisfied.

21    Fourth, as for Plaintiffs' claim that the Act violates the Takings Clause of the U.S.

22  Constitution by causing a decline of 25% in payments to out-of-network physicians for services

23  rendered, the claim fails.  This is because Plaintiffs do not have a constitutionally protected right

24  to a particular reimbursement rate.  The only protected right that these Plaintiffs might possess is

25  a right to bring a cause of action for the reasonable value of their rendered services (*e.g.*, a

26  quantum meruit claim).  But since the Act does not deprive Plaintiffs of this right, and since

27  Plaintiffs have not utilized the dispute resolution remedies that the Act provides, Plaintiffs cannot

28  allege a cause of action for a taking.

2

1   Finally, Plaintiffs' Supremacy Clause cause of action, based on the allegation that the Act

2   prohibits out-of-network providers from collecting for services they rendered to Medicare

3   beneficiaries, must fail because the Act is not applied to Medicare plans.  Moreover, the

4   Supremacy Clause does not provide Plaintiffs with a private right of action.

5   For the above reasons, Defendant's motion to dismiss should be granted, without leave to

6   amend.

7                            **SUMMARY OF THE AMENDED COMPLAINT**

8   Plaintiff AAPS is a physician-organization, and its members include both in-network and

9   out-of-network providers in California.  (Am. Comp. ¶ 7.)  Many of its members "have opted-out

10   of or are disenrolled from Medicare."  (*Id*.)

11   Plaintiff Dr. Natuzzi is a surgeon who lives and practices in California.  (*Id*. at ¶ 8.)  The

12   complaint alleges that Dr. Natuzzi is an out-of-network provider (*id*. at ¶ 20), but it does not

13   allege that Dr. Natuzzi has opted-out of Medicare.

14   Defendant is Shelley Rouillard, in her official capacity as the Director of the California

15   Department of Managed Health Care (DMHC).  (*Id*. at ¶ 9.)  DMHC is the agency responsible for

16   the execution of the laws of this state relating to health care service plans under the Knox-Keene

17   Health Care Service Plan Act of 1975.  (Cal. Health & Safety Code, §§ 1340, 1341.)

18   Plaintiffs generally claim that the Act is unconstitutional in that its out-of-network members

19   and Dr. Natuzzi are denied adequate reimbursement for their services under the Act.  (Am.

20   Comp., ¶¶ 2-5.)  Plaintiffs seek declaratory and injunctive relief under 42 U.S.C. section 1983 for

21   violations of the Due Process, Takings, and Supremacy Clauses of the U.S. Constitution.  (*Id*. at

22   ¶¶ 25-26, 33-34, 44-45.)

23   The cause of action for violation of due process alleges that the Act sets forth a process that

24   out-of-network providers must follow to challenge reimbursement rates that is too expensive and

25   time-consuming.  (*Id*. at ¶ 23.)  The cause of action for an unconstitutional taking alleges that,

26   since the Act was implemented, out-of-network providers have seen a decrease of roughly 25% in

27   their reimbursements from health plans.  (*Id*. at ¶ 29.)  The cause of action for violation of the

28   Supremacy Clause alleges that the Act is preempted by federal law.  Specifically, the complaint

3

alleges that Section 4507 of the Balanced Budget Act of 1997 (42 U.S.C. § 1395a), authorizes "Opted-Out" physicians to enter into private contracts with patients who are Medicare beneficiaries to obtain agreed-upon fees for services rendered, but the Act prohibits opted-out physicians from collecting anything for their services rendered to Medicare beneficiaries, other than perhaps a small co-pay.  (Am. Comp., ¶¶ 37-39.)

## SUMMARY OF THE RELEVANT PROVISIONS OF AB 72[3]

### I.   PATIENT PROTECTIONS

AB 72 requires that contracts for health care service plans contain a provision prohibiting surprise balance billing.  Surprise balance billing occurs when an out-of-network provider bills a consumer for amounts that exceeds the consumer's applicable cost-sharing for services performed at an in-network facility, or resulting from treatment at an in-network facility.  Balance billing was already prohibited in California in the context of emergency services and care before AB 72 became effective.  (*Prospect Medical Group, Inc. v. Northridge Emergency Medical Group*, 45 Cal.4th 497, 502 (2009).)  Under the Act, enrollees are responsible only for costs equal to what they would have paid if they had received the services from an in-network provider.  (Cal. Health & Safety Code, § 1371.9(a)(1).)[4]  This is referred to as the "in-network cost-sharing amount." (*Id.*)  Out-of-network providers are prohibited from billing or collecting any amount from the enrollee for their applicable services except for the in-network cost-sharing amount.  (§ 1371.9(a)(3).)

However, the above billing limitation does not apply if the enrollee has a health care service plan that pays for out-of-network services.  (§ 1371.9(c).)  Then, AB 72 permits an out-of-network provider to bill or collect from the enrollee the out-of-network cost sharing, but only

---

[3] AB 72 is divided into two parts.  The first part addresses health care service plans that are regulated by DMHC under the Health and Safety Code, the subject of this litigation, and the second part addresses insurance policies that are regulated by the Insurance Commissioner, which are not challenged in this litigation.  Accordingly, this motion only addresses health care service plans regulated by DMHC and not the nearly identical provisions related to insurance policies, insureds or insurers.

[4] All further statutory references will be to the California Health and Safety Code unless otherwise noted.

4

1   when the enrollee consents in writing to the services and only when certain requirements are met

2   (*e.g.*, time and form of notice).  (§ 1371.9(c)(1)-(6).)

3          The Act does not extend balance billing or surprise billing protections to all services

4   provided by out-of-network providers.  For example, the prohibition on balance billing does not

5   require a health care service plan to cover services that are not required by the plan or by law.  (§

6   1371.9(g).)  And the provisions do not apply to Medi-Cal managed health care service plans,

7   Medicare plans, self-insured plans, certain contracts with the State Department of Health Care

8   Services for public social services, or to emergency services and care.  (§ 1371.9(j)(k); *see also*

9   Exhibit 1, DMHC Guidance re: Surprise Medical Bills, Frequently Asked Questions, June 2017,

10  p. 2, attached to Request for Judicial Notice.)

11         To ensure that patient services are not compromised, the Act requires health plans to meet

12  existing network adequacy requirements, including but not limited to, inpatient hospital and

13  specialist physician services.  (§ 1371.31(a)(5).)

14  **II.  REQUIRED PROVIDER REIMBURSEMENT**

15         The Act guarantees that out-of-network providers will be reasonably reimbursed for

16  services subject to AB 72 in either one of two ways.  First, the health care service plan and the

17  out-of-network provider can agree on a reimbursement rate.  (§ 1371.31(a)(1).)  Second, if an

18  agreement is not reached, AB 72 requires plans to reimburse out-of-network providers at either

19  the greater of the average contracted rate or 125 percent of the amount Medicare reimburses on a

20  fee-for-service basis for the same or similar services in the general geographic region in which the

21  services are provided.[5]  (*Id.*)  AB 72 defines "average contracted rate" as the average of the

22  contracted commercial rates paid by the health plan for the same or similar services in the

23  geographic region.  (*Id.*)

24         To provide a fair and reasonable reimbursement rate to out-of-network providers, AB 72

25  requires each health plan, and its delegated entities, to provide to DMHC all of the following

26  information for the 2015 calendar year: (1) data listing average contracted rate for services most

27         [5] As explained above, these reimbursement provisions do not apply to Medi-Cal,
    Medicare, or to emergency services and care.  California Health and Safety Code § 1371.31(e)(f);
28  Exh. 1, p. 2.)

frequently provided in or resulting from services provided in contracted facilities by out-of-network providers in each geographic region in which the services are rendered; (2) its methodology for determining these average rates, including the highest and lowest contracted rates; and (3) its policies and procedures used to determine the average contracted rates. (§ 1371.31(a)(2)(A)(i), (ii), (iii).)  After 2017, when the Act became effective, and until the DMHC promulgates regulations that specify the standard health plans must use to determine their average contracted rates, the health plan, and its delegated entities, must then adjust the rate initially submitted by the Consumer Price Index for Medical Care Services.[6] (§ 1371.31(a)(2)(B).)

### III.   PROMPT RESOLUTION OF DISPUTED CLAIMS

####   A.   Health Plan's Internal Dispute Resolution Process

AB 72 directed DMHC to establish an independent dispute resolution process (IDRP) for the purpose of processing and resolving a claim dispute between a health care service plan and out-of-network provider for covered services.  (§ 1371.30(a)(1), (b)(1).)  However, before initiating IDRP, the out-of-network provider must have participated in the health plan's internal process for submitting and reviewing claims.  (§ 1371.30(a)(2).)  The plan has 45 business days to complete its claim review process.  (Cal. Code Regs. tit. 28, § 1300.71.38(f).)  If, after completing the health plan's internal claim process, the provider still disagrees with the amount of reimbursement, it can appeal the decision to IDRP.  While AB 72 contemplates that the provider completes the health plan's internal process before initiating IDRP, the provider may initiate IDRP if at least 45 business days have passed since the date the claim was submitted to the health plan, even if a decision has not been made.  (Exhibit 2, AB 72 Uniform Written Procedures and Guidelines, p. 2; *see also* § 1371.30(j) [DMHC authorized to "implement, interpret, or make specific" the Act's provisions by means of all-plan letters or similar instructions].)

/ / /

---

[6] By January 1, 2019, DMHC must specify a methodology that the health plans must use to determine the average contracted rates for services most frequently subject to section 1371.9. (§ 1371.31(a)(3)(A).)  The methodology must take into account, at a minimum, information from the independent dispute resolution process, the individual health provider's specialty and the geographic region in which the services are rendered.  (*Id.*)

6

**B.   The IDRP Process**

If either party appeals a claim to IDRP, the other party must participate in the appeal process.  (§ 1371.30(a)(3).)  The application for IDRP should include a narrative summary justification that addresses all information relevant to the initiating party's claimed reimbursement amount for the claim(s) at issue,[7] including, but not limited to, the following factors:

i.   the provider's training, qualifications, and length of time in practice;

ii.  the nature of the services provided;

iii. the fees usually charged by the provider;

iv.  prevailing provider rates charged in the general geographic area in which the services were rendered;

v.   other aspects of the economics of the medical provider's practice that are relevant; and,

vi.  any unusual circumstances in the case.[8]

(*See* 28 California Code of Regulations. § 1300.71(a)(3)(B)(i)-(vi).)

After receiving the application for IDRP, DMHC will transmit an initial Request for Opposing Party Response, which seeks information to determine if the dispute is within DMHC's jurisdiction.  (Exh. 2, p. 5.)  The opposing party's response must be submitted to DMHC within five business days.  (*Id*., p. 11.)  If there is jurisdiction, DMHC transmits a second Request for Opposing Party Response electronically, through the IDRP portal, which provides the opposing party with an opportunity to fully respond in writing to the initiating party's application.  (*Id*., p. 11.)  This second opposing party response must be submitted online, through the IDRP portal, within 20 business days.  (*Id*., p. 11.)  After receiving all the documents and payment, the independent review organization renders its decision electronically through the IDRP portal within 30 days.  (*Id*., p. 10.)  Once an IDRP decision is approved, the DMHC will electronically send the IDRP decision to both parties through the IDRP portal.  (*Id*., p. 11.)

---

[7] As explained further below, multiple claims can be "bundled" into one IDRP.
[8] These factors previously guided a plan's reimbursement of an out-of-network provider before AB 72 became effective.  A plan was considered to have complied with the Knox-Keene Act if it reimbursed a provider based on these factors.  The only new element created under AB 72 was to prohibit providers from surprise balance billing consumers.

7

The decision obtained through IDRP, is binding on both parties and must be implemented by the plan.  (*Id.*; § 1371.30(d).)  But "[i]f dissatisfied, either party may pursue any right, remedy, or penalty established under any other applicable law."  (*Id.*; Ex. 2, p. 7.)

**C.    IDRP Fees**

IDRP fees are split equally between the parties.  (§ 1371.30(b)(2); Ex. 2, p. 9.)  For purposes of economy and efficiency, AB 72 permits the party initiating IDRP to "bundle" claims submitted to the same plan for the same or similar services by the same out-of-network provider. (Cal. Health & Safety Code § 1371.30(b)(3).)  All of the claims to be bundled must have accrued within 365-days of each other. (Exh. 2, p. 8.)  A list of current IDRP fees is as follows:

**Standard rate (no dispute over correct coding of claims)[9]**

$315 per review of a claim

$315 per review of a bundle of 2-10 substantially similar claims

$340 per review of a bundle of 11-25 substantially similar claims

$395 per review of a bundle of 26-50 substantially similar claims

**Standard rate including coding review**

$330 per review of a claim

$330 per review of a bundle of 2-10 substantially similar claims

$355 per review of a bundle of 11-25 substantially similar claims

$415 per review of a bundle of 26-50 substantially similar claims

Again, these fees are split equally between the parties.  (§1371.30(b)(2).)

**STANDARD OF REVIEW**

**I.    STANDARDS FOR A MOTION TO DISMISS**

For purposes of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), all well-pleaded facts in the complaint are accepted as true and construed in the light most favorable

---

[9] After a medical provider examines or treats a patient, the insurance company needs to understand the services that were performed in order to process the bill.  Medical coders read a patient's medical chart and analyze it, determining the patient's diagnoses and any procedures performed. They then categorize those diagnoses and procedures according to a national classification system, assigning a specific numeric or alphanumeric code to each diagnosis or procedure.  The codes are used in the billing process.

to the nonmoving party.  (*Intri-Plex Techs., Inc. v. Crest Grp., Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007).)  Generally, a court may not consider material beyond the complaint in ruling on a Federal Rule of Civil Procedure 12(b)(6) motion.  (*Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).  However, "[a] court may take judicial notice of 'matters of public record' without converting a motion to dismiss into a motion for summary judgment," as long as the facts noticed are not "subject to reasonable dispute."  (*Lee*, 250 F.3d at 689; *see also United States v. Ritchie*, 342 F.3d 903, 908–09 (9th Cir. 2003).)

A plaintiff's obligation to adequately allege the grounds for his or her entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  (*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, (2007) [citations omitted].)  A court is not required to accept as true a "legal conclusion couched as a factual allegation."  (*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) [quoting *Twombly*, 550 U.S. at 555].)  "Factual allegations must be enough to raise a right to relief above the speculative level."  (*Twombly*, 550 U.S. at 555.)  A pleading must contain "enough facts to state a claim to relief that is plausible on its face."  (*Id*. at 570.)  If the "plaintiffs . . . have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed."  (*Id*.)

## II.   STANDARDS FOR A FACIAL CHALLENGE

### A.   The Instant Action is a Facial Challenge to the Act

It is important at the outset to define whether Plaintiffs' constitutional claims are "as-applied" or facial challenges to the Act.  To make this determination, courts use a "remedy-centered" approach.  (*John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010).)  Specifically, if a statute's challenger seeks to void the statute in its entirety against circumstances beyond the challenger's individual case – rather than simply as the statute is applied to their circumstances – the attack on the statute would be defined as "facial."  (*Id*.)

In the instant case, Plaintiffs' claims and the relief they seek – declaratory and injunctive relief that "the AB 72 is unconstitutional under the Due Process, Takings, and/or Supremacy

Clauses of the U.S. Constitution" – reach beyond the particular circumstances of these plaintiffs, and thus it is properly characterized as a facial challenge[10].

### B.    Facial Challenges Are Disfavored

In this case, the standard for bringing a facial challenge to a statute is critical.  The Supreme Court has explained that a plaintiff can only succeed in a facial challenge by "establish[ing] that no set of circumstances exists under which the Act would be valid," *i.e.*, that the law is unconstitutional in all of its applications.  (*United States v. Salerno*, 481 U.S. 739, 745 (1987).)  A facial challenge must fail where the statute has a "plainly legitimate sweep."  (*Washington v. Glucksberg*, 521 U.S. 702, 739-740, and n. 7 (1997).)  In determining whether a law is facially invalid, courts must be careful not to go beyond the statute's facial requirements and speculate about "hypothetical" or "imaginary" cases.  *See United States v. Raines*, 362 U.S. 17, 22 (1960) ["The delicate power of pronouncing an Act of Congress unconstitutional is not to be exercised with reference to hypothetical cases thus imagined"].)  Exercising judicial restraint in a facial challenge "frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy."  (*Id.*)

> Facial challenges are disfavored for several reasons.  Claims of facial invalidity often rest on speculation.  As a consequence, they raise the risk of premature interpretation of statutes on the basis of factually barebones records.  Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.  Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the

---

[10] With respect to their Due Process claim, Plaintiffs allege that they "seek a declaratory judgment that AB 72, *as applied*, constitutes a violation of the Due Process Clause . . . ."  (Am. Comp. ¶ 25 [emphasis added].)  However, in determining whether a claim presents a facial or "as-applied" challenge, "the label is not what matters."  (*Feldman v. Arizona Sec'y of State's Office*, 843 F.3d 366, 385 (9th Cir. 2016) [citations omitted].)  Because Plaintiffs' claim and the relief that would follow – an injunction barring California from implementing and enforcing AB 72 – "reach beyond the particular circumstances of these plaintiffs," it is properly characterized as a facial challenge.  (*Id.*)

1
2

Constitution.  We must keep in mind that a ruling of unconstitutionality frustrates the intent of the elected representatives of the people.

3

(*Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449-451 (2008)

4

[citations omitted].)

5

**ARGUMENT**

6

I.  **PLAINTIFFS DO NOT HAVE STANDING TO BRING THIS ACTION**

7

A.  **AAPS Lacks Associational Standing Because any Harm to its Members is Speculative**

8

Plaintiff AAPS purports to allege associational standing on behalf of its members, including

9

California ophthalmologist Michael Couris, M.D., who claim to "suffer ongoing financial harm

10

due to the denial of their rights under the Due Process, Takings, and Supremacy Clauses from the

11

implementation of AB 72."  (Am. Comp. ¶ 14.)  But Plaintiff AAPS has failed to allege

12

associational standing on behalf of its members because its allegations of potential harm are

13

speculative and, regardless, there is no obstacle to AAPS' members suing on their own behalf if a

14

billing issue arises.

15

"[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an

16

'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural

17

or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3)

18

it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable

19

decision."  (*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81

20

(2000).)  "An association has standing to bring suit on behalf of its members when its members

21

would otherwise have standing to sue in their own right, the interests at stake are germane to the

22

organization's purpose, and neither the claim asserted nor the relief requested requires the

23

participation of individual members in the lawsuit."  (*Id.*)

24

It is well-settled that a person claiming injury against the State, based on a violation of

25

property rights protected by the Constitution, has not suffered a violation unless and until the

26

person has unsuccessfully attempted to obtain just compensation through the procedures provided

27

by the State for obtaining such compensation.  (*Williamson Cty. Reg'l Planning Comm'n v.*

28

11

1  *Hamilton Bank of Johnson City*, 473 U.S. 172, 195 (1985).)  The State's action is not "complete"

2  in the sense of causing a constitutional injury "unless or until the State fails to provide an

3  adequate post deprivation remedy for the property loss." (*Id.*; *Hudson v. Palmer*, 468 U.S. 517,

4  532, n. 12 (1984).)  Because the Constitution is satisfied by a reasonable and adequate provision

5  for obtaining compensation after the alleged deprivation, a State's action is not "complete" until

6  the State fails to provide adequate compensation for the deprivation. (*Williamson County*, 473

7  U.S. at 194–195.)

8          In this case, although AAPS alleges that its out-of-network membership has suffered harm

9  in the form of a 25% decrease in payments for services rendered, AAPS is unable to adequately

10  allege that this purported harm *is a result of the Act*.  For AAPS' members to allege that they

11  suffered harm as a result of the Act, the following must first bear out: (1) the inability of its

12  members who provide services covered under the Act to reach agreements for reasonable

13  compensation with health care service plans with which they do not contract; (2) the setting of

14  unreasonable rates of reimbursement under the Act; (3) unsuccessful appeals pursuant to the

15  Act's IDRP; and, (4) the inability to seek reasonable rates of reimbursement in state court.  Given

16  those conditions precedent to any actual injury, AAPS has failed to allege it has standing to

17  pursue these claims on behalf of its members. (*See Coons v. Lew*, 762 F.3d 891, 897-898 (9th

18  Cir. 2014).  While AAPS makes the broad, conclusory allegation that the implementation of the

19  Act caused a sharp, unreasonable decline of 25% in payments to out-of-network physicians for

20  services rendered (Am. Comp. ¶ 3), conspicuously missing from the amended complaint are

21  allegations that its members who are out-of-network providers will not be reasonably reimbursed

22  for their services, either through the Act's default rate or, if the default rate is challenged, through

23  IDRP.  Indeed, there are no allegations that any of AAPS' members have availed themselves of

24  the reimbursement remedies provided by the Act.

25          Additionally, AAPS alleges that its members suffer *ongoing* financial harm due to the

26  implementation of the Act, "which prohibits Opted-Out Physicians from receiving private

27  payments from Medicare-enrolled patients . . . ." (Am. Comp. ¶ 13.)  But there are no allegations

28  that any of its members have *actually* been precluded from receiving private payments from

1   Medicare-enrolled patients, nor could there be, because the Act does not apply to Medicare plans.

2   (Exh. 1, p. 2.)  Moreover, there are no allegations that DMHC intends to apply the Act in such a

3   way as to preclude providers from receiving private payments from Medicare-enrolled patients.

4   In fact, the opposite is true – DMHC has issued written guidance to the public explaining that the

5   Act does not apply to Medicare plans.  (Exh. 1, p. 2.)

6       "[H]ypothetical, speculative or other 'possible future' injuries do not count in the standings

7   calculus."  (*Schmier v. U.S. Court of Appeals for Ninth Circuit*, 279 F.3d 817, 821 (9th Cir.

8   2002).)  Because any harm to AAPS' physician-members is based on what may happen in the

9   future if at some point in time an out-of-network physician is ultimately denied reasonable

10   reimbursement under the Act, AAPS lacks standing.[11]

11       **B.**    **Dr. Natuzzi Lacks Standing Because She Has Not Been Precluded from Receiving Private Payments from Medicare-Enrolled Patients, and Has Not Availed Herself of the Act's Remedies for Reimbursement**

12

13       The amended complaint alleges that "Plaintiff Dr. Natuzzi has standing based on losses she

14   has already suffered due to the implementation of AB 72, in the form of a loss of 25% of her

15   revenue in 2018 due to reduced reimbursements by health plans."  (Am. Comp. ¶ 14.)  Also, the

16   amended complaint contains the allegation that, "[w]hile AB 72 purportedly exempts medical

17   services rendered on an emergency basis, Defendant's implementation of AB 72 has caused plans

18   to decrease payments by an unreasonable 25% to out-of-network physicians, including Plaintiff

19   Dr. Natuzzi, on all services including those provided on an urgent or emergency basis.  (Am.

20   Comp. ¶ 20.)  But Dr. Natuzzi's claim of standing fails for the same reasons that AAPS' does –

21   her claims are fatally speculative.

22       Dr. Natuzzi fails to adequately allege a nexus between the implementation of the Act and

23   her purported loss of revenue.  First, Dr. Natuzzi fails to allege that she has availed herself of a

24   health plan's internal claim process or has participated in IDRP.  Because it is entirely possible

25   that if she had participated in either of these remedies under the Act she may not have suffered

26   any purported loss of revenue, Dr. Natuzzi has not adequately alleged standing.  (*See Coons*, 762

27         [11] Additionally, as mentioned above, AAPS has alleged no facts showing why any real or even perceived obstacle prevents its members from suing on their own behalf should a billing

28   issue arise in the future.

13

F.3d at 897-898.)

Second, Dr. Natuzzi fails to allege that she has *actually* been precluded from receiving private payments from Medicare-enrolled patients, or that she has a reasonable concern that the Act will be applied in such a way as to preclude her from doing so.  She cannot do so, since the Act is not applied to services provided to Medicare beneficiaries (Exhibit 1, p. 2).

Finally, Dr. Natuzzi is unable to allege facts that would establish that the Act is the cause of her claimed 25% decrease in reimbursement for emergency services, because the Act does not apply to emergency services and care.  (§ 1371.9(j)(k); *see also* Exhibit 1, p. 2.)

Because Dr. Natuzzi has not availed herself of the Act's reimbursement remedies; because she has not been precluded from receiving private payments from Medicare-enrolled patients; and because any decrease in her reimbursements for emergency services were not caused by the Act, Dr. Natuzzi lacks standing.

## II.   EVEN IF PLAINTIFFS HAD STANDING, THEY CANNOT ALLEGE A VIOLATION OF THEIR CONSTITUTIONAL RIGHTS

### A.   The Act Does Not Violate the Due Process Clause of the U.S. Constitution

Plaintiffs' claim that the Act's process for challenging underpayment violates the Due Process Clause must be rejected, since the process is not unduly costly or lengthy, and the process is fair.  Moreover, because the Act authorizes Plaintiffs to file a lawsuit in state court if they are dissatisfied with the administrative remedies under the Act, due process is satisfied.

The state and federal constitutions prohibit the government from depriving a person of property without due process of law.  (U.S. Const. 14th Amend., § 1.)  Due process can involve both procedural and substantive due process, but it appears that only procedural due process is raised as an issue in this case.  As relevant here, Plaintiffs allege that "[t]he mandatory AB 72 IDRP, and pre-IDRP, procedures for physicians who are underpaid by health plans violate the Due Process Clause by creating a cost-prohibitive impediment to challenging underpayments." (Am. Comp. ¶ 23.)  But, regardless of how the issues are framed in the complaint, at bottom, the Act's procedures for challenging underpayments are not unconstitutional.  Moreover, these

14

1    procedures are not ultimately binding on providers because they can always seek judicial review

2    of a specific reimbursement claim.  (§ 1371.30(d).)

3        1.  <u>Plaintiffs Have No Constitutionally Protected Interest in a Particular
            Reimbursement Rate or Future Reimbursements</u>

4

5        The Due Process Clause protects recognized property interests; absent a property interest, a

6    claim is not cognizable.  (*Peterson v. United States Dept. of Interior*, 899 F.2d 799, 807 (9th Cir.

     1990).)  Property interests protected by the constitution are "interests that a person has already
7
     acquired in specific benefits."  (*Board of Regents v. Roth*, 408 U.S. 564, 576 (1971); *Hoopa*
8
     *Valley Tribe v. Christie*, 812 F.2d 1097, 1102 (9th Cir. 1987).)  A property interest is more than a
9
     unilateral expectation, it is "a legitimate claim of entitlement."  (*Board of Regents*, 408 U.S. at
10
     577.)  Entitlements are not created by the constitution, but are defined by independent sources
11
     such as state law, statutes, ordinances, regulations or express and implied contracts.  (*Id.*; *Lucero*
12
     *v. Hart*, 915 F.2d 1367, 1370 (9th Cir. 1990).)  If a right has not vested, it is not a property
13
     interest protected by the due process or takings clause.  (*Peterson*, 899 F.2d at 807.)

14       In this case, Plaintiffs do not have a constitutionally protected property interest in services

15   they have yet to provide (*i.e.*, future reimbursements).  (*Id.*)  Additionally, Plaintiffs have no

16   protected interest in a particular rate of reimbursement.  (*See Sierra Med. Servs. All. v. Kent*, 883

     F.3d 1216, 1226 (9th Cir. 2018) [ambulance companies voluntarily provided services and
17
     therefore have no constitutionally protected interest in any particular reimbursement rate].)  Here,
18
     the only possible interest Plaintiffs might have are *claims* for recovery of the reasonable value of
19
     their rendered services.  (*See In re De Laurentis Entm't Grp. Inc.*, 963 F.2d 1269, 1272 (9th Cir.
20
     1992) [California law provides *a right of action* for recovery for services rendered under quantum
21
     meruit]; *see also Bell v. Blue Cross of California*, 131 Cal.App.4th 211, 216-217 (2005)
22
     [emergency room physicians who did not participate in health care service plan had standing to
23
     bring state court action against plan, under common law quantum meruit, for plan's
24
     reimbursements that were allegedly below value of providers' service].)  In other words, the
25
     reasonable value of the services Plaintiffs rendered is not a constitutionally protected interest, but
26
     the right to seek recovery of same under California law may be.  (*See Lujan v. G & G Fire*
27
     *Sprinklers, Inc.*, 532 U.S. 189, 196 (2001).)

28

2.  <u>Plaintiffs Cannot Allege that the Act's Reimbursement Procedures Violate Due Process</u>

Due process is a flexible concept and its procedural requirements vary depending upon the particular deprivation.  (*Orloff v. Cleland*, 708 F.2d 372, 378 (9th Cir. 1983).)  "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.  '"[D]ue process," unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.'"  (*Lujan*, 532 U.S. 189, 196-197, [quoting *Cafeteria & Restaurant Workers v. McElroy*, 367 U.S. 886, 895 (1961).)  "[D]ue process does not guarantee any particular form of state procedure."  (*Lyeth v. Chrysler Corp.*, 929 F.2d 891, 895 (2d Cir. 1991).)  Rather, "a state may choose the remedy best adapted, in the legislative judgment, to protect the interests concerned provided its choice is not unreasonable or arbitrary, and the procedure it adopts satisfies the constitutional requirements of reasonable notice and opportunity to be heard."  (*Hardware Dealers' Mut. Fire Ins. Co. of Wis. v. Glidden Co.*, 284 U.S. 151, 158 (1931).)

In *Lujan*, the state of California withheld funds from a public works subcontractor and imposed penalties after receiving notice that the subcontractor had violated provisions of the state Labor Code.  In deciding the subcontractor's due process challenge to the Labor Code, the Supreme Court characterized the subcontractor's interest as merely a contractual interest, a "deprivation of payment that it contends it is owed under a contract" that could be adequately protected through a breach of contract suit.  (*Lujan*, 532 U.S. at 196.)  The Court found:

> [subcontractor] has not been denied any present entitlement.  [Subcontractor] has been deprived of payment that it contends it is owed under a contract, based on the State's determination that [subcontractor] failed to comply with the contract's terms.  [Subcontractor] has only a claim that it did comply with those terms and therefore that it is entitled to be paid in full.  Though we assume for purposes of decision here that [subcontractor] has a property interest in its claim for payment . . . it is an interest . . . that can be fully protected by an ordinary breach-of-contract suit.

(*Id.*)  The Court held, "[b]ecause we believe that California law affords [subcontractor] sufficient opportunity to pursue that claim in state court, we conclude that the California statutory scheme does not deprive [subcontractor] of its claim for payment without due process of law.  (*Id.* at 195.)

16

Similarly, in this case, because the Act affords Plaintiffs the right to pursue their claims for the reasonable value of their services in state court – after exhausting the Act's dispute resolution procedure – the Act provides due process.   Although Plaintiffs allege that the Act's dispute resolution procedure "is too expensive and time-consuming" (Am. Comp. at ¶ 23), the *maximum* IDRP fee is only $207.50 ($415 split equally between the provider and the plan).  Significantly, to make the process more economical both in terms of money and time, the Act permits up to 50 similar claims to be bundled into a single IDRP.  Also, because the IDRP is a "paper review," providers do not have to travel or take time off to appear in person at a hearing.  And finally, although no IDRPs have been completed as of yet (only two have been initiating as of the time of this motion), the entire dispute resolution process under the Act, from initiation of a plan's internal process to the rendering of an IDRP decision, should take no more than four months.[12] (*See* Exh. 2, p. 11.)

The Act's dispute resolution procedure, while perhaps "something of a hardship" in some cases, cannot be said to deprive Plaintiffs of their claim for the reasonable value of the services they rendered.  (*See Lujan*, 532 U.S. at 197 [due process does not require convenience]; *see also Lyeth v. Chrysler Corp.*, 929 F.2d at 896 [state's statutory scheme requiring parties to complete arbitration before bringing suit in court found constitutional]; *Peick v. Pension Ben. Guar. Corp.* 724 F.2d 1247, 1277 (7th Cir. 1983).)  Accordingly, Plaintiffs' Due Process claim should be dismissed with prejudice.

### B.    The Act Does Not Violate the Takings Clause of the U.S. Constitution

In *Williamson County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172 (1985), the Supreme Court identified two hurdles in the way of a taking claim brought in federal court against states and their political subdivisions.  First, *Williamson County* affirmed the principle that "a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." (*Id*. at 186.) The second, and independent, hurdle established by *Williamson County* requires plaintiffs to

---

[12] The fact that no IDRPs have been completed as of yet illustrates a significant problem with this action: "[c]laims of facial invalidity often rest on speculation.  As a consequence, they raise the risk of premature interpretation of statutes on the basis of factually barebones records."  (*Washington State Grange*, 552 U.S. at 449.)

17

"seek compensation through the procedures the State has provided for doing so" before turning to the federal courts.  (*Id*. 473 U.S. at 194-195.)

Because DMHC has not made *any* final decisions with respect to provider claims for increased reimbursement rates; because Plaintiffs have not utilized the Act's procedures for resolving reimbursement rate disputes; and because Plaintiffs have not been deprived of their claims for increased reimbursement, their Takings claim should be dismissed.

     1.   The Takings Claim is Not Ripe Because DMHC Has Not Made a Final Decision

Given the interest at issue in this case – the right to bring a claim for reasonable reimbursement – it is questionable whether DMHC can ever make a "final decision" as contemplated by *Williamson County*, since the Act expressly permits providers to bring suit in state court for reasonable reimbursement.  (§ 1371.30(d).)  But even if DMHC's adoption of an IDRP decision could be construed as a "final decision," there is no allegation in the amended complaint that DMHC has adopted any IDRP decision.  Indeed, there are no allegations that Plaintiffs have even engaged in IDRP.  Because Plaintiffs have not overcome the first hurdle of *Williamson County*, their Takings claim should be dismissed.

     2.   The Takings Claim Must Fail Because Plaintiffs Did Not Utilize the Procedures for Resolving Reimbursement Disputes Under the Act

The second hurdle established by *Williamson County* requires Plaintiffs to avail themselves of the Act's IDRP before turning to federal court.  (*See Id*., at 194-195.)  Here, Plaintiffs have not alleged that they have utilized the dispute resolution procedures established under the Act.  If Plaintiffs were to seek administrative relief under these procedures, mutually acceptable solutions might well be reached with regard to individual cases, thereby obviating any need to address any constitutional questions.  "The potential for such administrative solutions confirms the conclusion that the taking issue . . . simply is not ripe for judicial resolution."  (*Williamson County*, 473 U.S. at 187 [citation omitted].)  Because Plaintiffs have not overcome the second hurdle of Williamson County, their Takings claim should be dismissed.

     3.   There is No Taking Because Plaintiffs Have the Right to Pursue Reimbursement Claims in State Court

In addition to *Williamson County's* requirement that Plaintiffs exhaust their remedies under the Act, Plaintiffs must also demonstrate that they are foreclosed from bringing their claims for

18

increased reimbursement in state court.  If a state's *courts* offer an adequate procedure for seeking just compensation, the state has not declined to pay for the taking unless the plaintiff has pursued that remedy and has been denied relief.  (*Jama Constr. v. City of Los Angeles*, 938 F.2d 1045, 1047-1048 (9th Cir. 1991).)  Accordingly, until state court procedures have been pursued, federal courts lack subject matter jurisdiction over taking claims.  (*Id.* at 1048; *Southern Pacific Transp. Co. v. City of Los Angeles*, 922 F.2d 498, 502 (9th Cir. 1990).)

As explained above, California law provides a plaintiff with a right to bring a claim in state court for the reasonable value of services rendered – quantum meruit.  (*See In re De Laurentiis Entm't Grp. Inc.*, 963 F.2d at 1272; *Bell*, 131 Cal.App.4th at 216-217.)  Because the State has never taken that right from Plaintiffs, there has been no taking.  Accordingly, Plaintiffs' Takings claim should be dismissed.

### C.   Plaintiffs are Barred from Bringing a Cause of Action Under the Supremacy Clause of the U.S. Constitution

Finally, Plaintiffs assert a cause of action for violation of the Supremacy Clause of the U.S. Constitution, claiming that the Act prohibits out-of-network providers from collecting for their services rendered to Medicare beneficiaries, in violation of the Supremacy Clause of the U.S. Constitution.  This claim should be rejected for two reasons.

First, the Act is not, and has never been, applied to Medicare plans.  (*See also* Exhibit 1, p. 2.)  So Plaintiffs' allegation that the Act precludes recovery for services rendered to Medicare beneficiaries is inaccurate.

Second, even if the allegations were true, the Supremacy Clause claim should be rejected, because "the Supremacy Clause is not the source of any federal rights, and certainly does not create a cause of action."  (*Sierra Med. Servs. All. v. Kent*, *supra*, 883 F.3d at 1223 [quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1383 (2015)].)  Because Plaintiffs do not have a private right of action with respect to their Supremacy Clause claim, the claim should be dismissed with prejudice.

///

///

///

19

1

**CONCLUSION**

2        Based on the forgoing, Defendant's motion to dismiss should be granted, without leave to

3   amend.

4   Dated:  June 21, 2018                          Respectfully Submitted,

5                                                  XAVIER BECERRA
                                                   Attorney General of California
6                                                  NIROMI W. PFEIFFER
                                                   Supervising Deputy Attorney General
7

8

9                                                  /S/ Darrell W. Spence
                                                   DARRELL W. SPENCE
10                                                 Deputy Attorney General
                                                   Attorneys for Defendant Department of
11                                                 Managed Health Care

12

13   13119340.docx

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

20