UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASSOCIATION OF AMERICAN PHYSICIANS & SURGEONS, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>SHELLEY ROUILLARD, in her official capacity as the Director of the California Department of Managed Health Care,<br><br>Defendant. | No. 2:16-cv-02441-MCE-EFB<br><br>**MEMORANDUM AND ORDER** |

By way of this action, Plaintiffs Association of American Physicians and Surgeons, Inc. ("AAPS") and Dr. Eileen Natuzzi ("Dr. Natuzzi") seek declaratory and injunctive relief against Shelley Rouillard, in her official capacity as the Director of the California Department of Managed Health Care, ("Defendant") on the basis that Assembly Bill No. 72 ("the Act" or "AB 72"), which passed into law on September 23, 2016, violates multiple constitutional rights of AAPS members and Dr. Natuzzi. Pls.' First Am. Compl., ¶¶ 1–6 (ECF No. 33). More specifically, Plaintiffs allege causes of action for violations of the Due Process, Takings, and Supremacy Clauses of the United States Constitution. Id.

1

Presently before the Court is Defendant's Motion to Dismiss Plaintiffs' First Amended Complaint ("FAC") for failure to state a claim upon which relief can be granted. Def.'s Mot. To Dismiss (ECF No. 34). For the following reasons, Defendant's Motion is GRANTED with one (1) final leave to amend.

**BACKGROUND**

Out-of-network physicians, who are called "noncontracting" physicians by AB 72, do not have the benefits or obligations of being contractually bound with insurance companies. There are both advantages and disadvantages to patients and physicians resulting from an out-of-network status. Some physicians are out-of-network not by choice, but because insurance companies increased their profits by excluding them for reasons other than quality of care. Out-of-network physicians often lack the referral volume of physicians who are within the networks of insurance companies, and, as a result, out-of-network physicians tend to provide more charity care than in-network physicians do. To remain in business, out-of-network physicians may charge more for certain services than the in-network insurance reimbursement rates.

Insured patients, in many cases, obtain policies that require their insurance companies to pay charges submitted by out-of-network physicians, or at least a substantial percentage of those charges. The only meaningful leverage that a physician or hospital has in negotiating a contract with an insurance company is the option of the physician or hospital to go out-of-network and not accept the insurance company rates. AB 72 denies the right of a physician to go out-of-network with an insurance company and charge out-of-network rates. Signed into law by the Defendant Governor of California on September 23, 2016, AB 72 adds several new sections to the Health and Safety Code and the Insurance Code to limit the rights of reimbursement for out-of-network physicians. Specifically, the Act requires the following for out-of-network physicians, effective July 1, 2017:

> [U]nless otherwise agreed to by the noncontracting individual health professional and the plan, the plan shall reimburse the greater of the average contracted rate or 125 percent of the amount Medicare reimburses on a fee-for-service basis for the same or similar services in the general geographic region in which the services were rendered. For the purposes of this section, "average contracted rate" means the average of the contracted commercial rates paid by the health plan or delegated entity for the same or similar services in the geographic region. This subdivision does not apply to subdivision (c) of Section 1371.9 or subdivision (b) of this section.

AB 72, § 2 (adding Section 1371.31 to the Health and Safety Code).

According to Plaintiff, the Act prohibits an out-of-network physician from recovering fully on his or her claims for services lawfully rendered. Specifically, the Act establishes that, beginning with health plans issued on or after July 1, 2017:

> An enrollee shall not owe the noncontracting individual health professional more than the in-network cost-sharing amount for services subject to this section . . . A noncontracting individual health professional shall not bill or collect any amount from the enrollee for services subject to this section except for the in-network cost-sharing amount. . . . If the noncontracting individual health professional has received more than the in-network cost-sharing amount from the enrollee for services subject to this section, the noncontracting individual health professional shall refund any overpayment to the enrollee within 30 calendar days after receiving payment from the enrollee.

AB 72, § 3 (adding Section 1371.9 to the Health and Safety Code). This ban in the Act on collecting from enrollees purportedly has the effect of preventing out-of-network physicians from recovering their fees from the insurance carriers that cover the enrollees for services rendered.

In addition, the Act requires the Department, by September 1, 2017, to "establish an independent dispute resolution process for the purpose of processing and resolving a claim dispute between a health care service plan and a noncontracting individual health professional for services" rendered. AB 72 § 1 (adding Section 1371.30 to the Health and Safety Code). Out-of-network physicians are thereby required to participate in this alternative dispute resolution on their claims, rather than immediately pursue their

3

remedies in court.

In its instant Motion, Defendant emphasizes, however, that a health care service plan and out-of-network provider are permitted to "agree on a reimbursement rate." ECF No. 34 at 5. Only if no agreement is reached does AB 72 require plans to reimburse relevant providers at no less than the statutory default rate. Moreover, to calculate that rate,

> AB 72 requires each health plan, and its delegated entities, to provide to DMHC all of the following information for the 2015 calendar year: (1) data listing average contracted rate for services most frequently provided in or resulting from services provided in contracted facilities by out-of-network providers in each geographic region in which the services are rendered; (2) its methodology for determining these rates, including the highest and lowest contracted rates; and (3) its policies and procedures used to determine the average contracted rates.

Id. at 5–6.

Defendant further stresses, as to the dispute resolution procedures, that if dissatisfied with the results of arbitration, "either party may pursue any right, remedy, or penalty established under any other applicable law." Id. at 8 (quoting Cal. Health & Safety Code § 1371.30(d)). Despite the foregoing procedures, Plaintiffs allege that Dr. Natuzzi is pursuing claims, at least in part, "based on losses she has already suffered due to the implementation of AB 72, in the form of a loss of 25% of her revenue in 2018 due to reduced reimbursement by health plans." ECF No. 33 at ¶ 14.

In light of the above facts, Plaintiffs allege Defendant's implementation of the Act violates the Due Process, Takings, and Supremacy Clauses of the Constitution. Defendant has now moved to dismiss for failure to state a claim, arguing that Plaintiffs have once again failed to allege they have standing to bring their claims and that those causes of action fail on the merits in any event.

///
///
///
///

**STANDARDS**

On a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), all allegations of material fact must be accepted as true and construed in the light most favorable to the nonmoving party.[1]  Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337-38 (9th Cir. 1996).  Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).

A complaint attacked by a Rule 12(b)(6) motion to dismiss does not require detailed factual allegations.  But "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Id. (internal citations and quotations omitted).  A court is not required to accept as true a "legal conclusion couched as a factual allegation."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009) (quoting Twombly, 550 U.S. at 555).  "Factual allegations must be enough to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555 (citing 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1216 (3d ed. 2004) (stating that the pleading must contain something more than "a statement of facts that merely creates a suspicion [of] a legally cognizable right of action.")).

Furthermore, "Rule 8(a)(2) . . . requires a showing, rather than a blanket assertion, of entitlement to relief."  Twombly, 550 U.S. at 556 n. 3 (internal citations and quotations omitted).  Thus, "[w]ithout some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirements of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests."  Id. (citing 5 Charles

---

[1] All further references to "Rule" or "Rules" shall be to the Federal Rules of Civil Procedure unless otherwise indicated.

Alan Wright & Arthur R. Miller, supra, at § 1202).  A pleading must contain "only enough facts to state a claim to relief that is plausible on its face." Id. at 570.  If the "plaintiffs . . . have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." Id.  However, "[a] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" Id. at 556 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

     A court granting a motion to dismiss a complaint must decide whether to grant leave to amend.  Leave to amend should be "freely given" where there is no "undue delay, bad faith or dilatory motive on the part of the movant,…undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment…." Foman v. Davis, 371 U.S. 178, 182 (1962); Eminent Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003) (listing the Foman factors as those to be considered when deciding whether to grant leave to amend).  Not all of these factors merit equal weight.  Rather, "the consideration of prejudice to the opposing party…carries the greatest weight." Id. (citing DCD Programs, Ltd. v. Leighton, 833 F.2d 183, 185 (9th Cir. 1987)).  Dismissal without leave to amend is proper only if it is clear that "the complaint could not be saved by any amendment." Intri-Plex Techs. v. Crest Group, Inc., 499 F.3d 1048, 1056 (9th Cir. 2007) (citing In re Daou Sys., Inc., 411 F.3d 1006, 1013 (9th Cir. 2005); Ascon Props., Inc. v. Mobil Oil Co., 866 F.2d 1149, 1160 (9th Cir. 1989) ("Leave need not be granted where the amendment of the complaint…constitutes an exercise in futility….")).

## ANALYSIS

     As a threshold matter, the standard for bringing a constitutional challenge to a statute is critical, and in this case, the parties dispute whether Plaintiffs' action challenges the Act on its face or "as-applied" to their specific circumstances.  Plaintiffs

6

argue their FAC represents an as-applied challenge because it seeks to enjoin Defendant from implementing the Act against AAPS members and Dr. Natuzzi, specifically. Pls.' Opp'n Def.'s Mot. to Dismiss, 7–8 (ECF No. 36). Indeed, "Plaintiffs do not contend that there is no possible constitutional application of [the Act], which is the demanding standard that must be met under a facial challenge to a statute." Id. Defendant argues, on the other hand, that because Plaintiffs' FAC goes beyond the Act's application to AAPS members and Dr. Natuzzi, and seeks to enjoin enforcement of the Act outright, the action is a facial challenge, requiring Plaintiffs to prove no constitutionally permissible application exists.

      Plaintiffs' FAC in several portions narrows the alleged constitutional injuries to AAPS members and Dr. Natuzzi, and in some instances, out-of-network physicians providing medical services. See ECF No. 33 ¶¶ 18–21, 24–25. Accordingly, the Court concludes Plaintiffs have sufficiently attempted to plead as applied challenges to the Act's enforcement.[2] This characterization, however, nonetheless fails to save Plaintiffs' claims because they have not alleged either: (1) that they have the requisite standing to pursue their claims; or (2) sufficient facts to support their causes of actions on the merits.

      **A.**      **Plaintiffs Have Not Adequately Alleged The Requisite Standing To Pursue Their Claims.**

      "To establish standing, a plaintiff must show that (1) he or she has suffered an injury in fact that is concrete and particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision." WildEarth Guardians v. U.S. Dep't of Agric., 795 F.3d 1148, 1154 (9th Cir. 2015) (internal quotations marks and citations omitted). "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires

---

[2] Since Plaintiffs concede they are not pursuing a facial challenge, Defendant's Motion to Dismiss on that basis is moot.

7

the participation of individual members in the lawsuit." Id. at 1155 (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 181 (2000)).

As to Dr. Natuzzi's individual standing, Plaintiffs allege "Dr. Natuzzi has standing based on losses she has already suffered due to the implementation of AB 72, in the form of a loss of 25% of her revenue in 2018 due to reduced reimbursements by health plans. These injuries to Plaintiff Dr. Natuzzi are ongoing and continuous." ECF No. 33 at ¶ 14. Regarding AAPS members, Plaintiffs' FAC alleges:

> Among the membership of Plaintiff AAPS in California are Opted-Out Physicians who have a federal right to enter into private contracts with Medicare-enrolled patients for private payment for services rendered. These members of AAPS suffer ongoing financial harm due to the implementation of [the Act]….and [the Act] is causing losses to Opted-Out Physicians by infringing on their federal right to receive payment from these patients at a privately agreed rate.

ECF No. 33 at ¶ 13.

Noticeably absent, however, are any allegations addressing the Court's concerns, as set forth in its prior Order, that Plaintiffs need to allege facts demonstrating: "(1) the inability of out-of-network providers to reach agreements for reasonable compensation with health care service plans; (2) the setting of unreasonable rates of reimbursement; and (3) unsuccessful appeals pursuant to AB 72's independent dispute resolution process." ECF No. 31 at 8. General allegations that Dr. Natuzzi lost revenue due to reduced reimbursements and that AAPS members may suffer losses in connection with Medicare-enrolled patients are not enough because Plaintiffs have not alleged they attempted to reach agreements for reasonable compensation, that the rates of reimbursement were instead unreasonable, or that Dr. Natuzzi or any of AAPS's members attempted to appeal any unreasonable rate by way of AB 72's dispute resolution process. Plaintiffs have not set forth any facts creating a nexus between their bald assertions above and any provision of the Act, and their claims thus remain speculative at best. See Coons v. Lew, 762 F.3d 891, 897 (9th Cir. 2014) (citing Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013) ["[W]e have repeatedly

8

reiterated that threatened injury must be <u>certainly impending</u> to constitute injury in fact, and that allegations of <u>possible</u> future injury are not sufficient."]). Because Plaintiffs' FAC is devoid of any such showing, they fail to demonstrate the actual or imminent injury in fact required to properly allege standing.

### B.   Even If Plaintiffs Had Standing, Their Claims, As Currently Pled, Nonetheless Fail On The Merits

#### 1.   Due Process

According to Plaintiffs, the Act violates the Due Process Clause by requiring that physicians "participate in a cumbersome [and] futile internal review process with the health plan, and then [subjecting them] to a dispute-resolution fee with [the Act's] IDRP which is often larger than the amount in dispute."  ECF No. 33 at ¶ 24.  Plaintiffs contend these procedures render the process too expensive and time-consuming for Dr. Natuzzi and AAPS members, prohibiting Plaintiffs from contesting underpayments by health plans.  <u>Id.</u>  Plaintiffs therefore argue the Act violates the Due Process Clause given its "expensive [and] impractical procedures for challenging underpayments.  <u>Id.</u> at ¶ 25.

Defendant argues that Plaintiffs' Due Process claim fails for two reasons.  First, Defendant contends Plaintiffs do not have a constitutionally protected interest in obtaining either a certain rate of reimbursement from plans or future reimbursements for services not yet rendered.  Additionally, according to Defendant, the prescribed procedures in the Act do not deprive Plaintiffs of due process because the IDRP is not unreasonably burdensome and because the Act allows Plaintiffs to pursue their claims for reimbursement in state court.  For the reasons stated below, Plaintiffs' Due Process challenge is DISMISSED.

A § 1983 claim based upon procedural due process consists of (1) a deprivation of a liberty or property interest protected by the Constitution, and (2) a denial of adequate procedural protections.  <u>See</u> <u>Wilkinson v. Austin</u>, 545 U.S. 209, 221 (2005); <u>see</u> <u>also</u> <u>Brewster v. Bd. of Educ. of the Lynwood Unified Sch. Dist.</u>, 149 F.3d 971, 982 (9th Cir. 1998).  To have a property interest, a person must have a legitimate claim of

entitlement to the property. See Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972).

> Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

Id.

If a constitutionally protected property interest exists, the government must provide the deprived individual due process in the form of notice and an opportunity to respond. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546 (1985). Procedural Due Process has no technical definition and must be analyzed according to the particular surrounding circumstances. See Cafeteria & Restaurant Workers v. McElroy, 367 U.S. 886, 895 (1961).

It follows that the Court must first determine whether the Act deprives Plaintiffs of some constitutionally protected interest. Plaintiffs argue the Act is designed to confiscate a portion of Plaintiffs' expected reimbursement rates for rendered services, which they describe as forcing providers "to give away a portion of his livelihood." ECF No. 36 at 11 (quoting Bell v. Blue Cross of Cal., 131 Cal. App. 4th 211, 220 (2005)). Plaintiffs contend that the Act "compel[s] physicians to accept underpayments for the services they render," depriving members of a portion of their property. Id. In response, Defendant contends the Act cannot be found confiscatory under the Due Process Clause because it does not compel Plaintiffs to accept any particular rate. Def.'s Reply Supp. Mot. Dismiss, 4–5 (ECF No. 37). "[N]o one is arguing that providers must accept whatever amount of reimbursement a health plan offers for services rendered." Id. at 5.

The viability of Plaintiffs' Due Process claim hinges on the Court accepting Plaintiffs' interpretation of how the Act will affect out-of-network physicians. The problem with Plaintiffs' argument, however, is that, as stated above, while Plaintiffs' assertions may eventually be proven correct once the Act is actually applied to certain physicians, it does not, by its terms, impose a mandatory rate that this Court can determine is

confiscatory as applied here.  To the contrary, a plain reading of the statute indicates the Act merely imposes a floor, or a minimum rate physicians can expect to recover, for services subject to the Act.  If a noncontracting physician is not satisfied with the minimum payments, he or she has an opportunity to resolve the dispute with the plan.  If the physician fails to obtain reasonable rates through the dispute resolution process, he or she also has the option to bring a claim in state court to recover the reasonable value of his or her services.  Plaintiffs' FAC, however, contains no facts showing Dr. Natuzzi or any AAPS members sought reimbursement through the Act's dispute resolution mechanisms.  Consequently, without any facts showing Plaintiffs were denied reasonable compensation for rendered services, the Court cannot conclude the Act deprived Plaintiffs of a constitutionally protected property interest.  Plaintiffs' Due Process claim is therefore DISMISSED on this basis.

Moreover, even if Plaintiffs have adequately pleaded a property interest deprivation, they still failed to allege facts alleging that the IDRP provisions of the Act themselves deny them due process.  According to Plaintiffs, the IDRP is prohibitively burdensome in violation of the Due Process Clause because it "requires that physicians first participate in a cumbersome, futile internal review process with the health plan, and then be subjected to a dispute-resolution fee with [the IDRP] which is often larger than the amount in dispute."  ECF No. 33 at ¶ 24.  Plaintiffs contend, as a result, that the Act "renders the process too expensive and too time-consuming for Plaintiff Dr. Natuzzi and AAPS members to contest underpayments by health plans on individual claims."  Id.

Defendant responds that "because the Act affords Plaintiffs the right to pursue their claims for the reasonable value of their services in state court—after exhausting the Act's dispute resolution procedure—the Act provides due process."  ECF No. 34 at 17.  "The Act's dispute resolution, while perhaps something of a hardship in some cases, cannot be said to deprive Plaintiffs of their claim for the reasonable value of the services they rendered."  Id. (internal citations and quotation marks omitted).  Defendant's arguments are more persuasive.

"Due process is flexible and calls for such procedural protections as the particular situation demands." Mathews v. Eldridge, 424 U.S. 319, 334 (1976) (citing Morrison v. Brewer, 408 U.S. 471, 481 (1972)). "A state may choose the remedy best adapted, in [its] legislative judgment, to protect the interests concerned provided its choice is not unreasonable or arbitrary, and the procedure it adopts satisfies the constitutional requirements of reasonable notice and opportunity to be heard." Lyeth v. Chrysler Corp., 929 F.2d 891, 895 (2d Cir. 1991) (citing Hardware Dealers Mut. Fire Ins. Co. v. Glidden Co., 284 U.S. 151, 158 (1931)) (internal quotation marks omitted).

In this case, the Court cannot determine based on the FAC whether the IDRP is "cost-prohibitive," or so burdensome as to deprive Plaintiffs of due process, because there are no facts alleged demonstrating how the IDRP operates in each particular case. Without sufficient facts showing the Act adversely impacted Plaintiffs' ability to obtain "fair and reasonable return," Fed. Power Comm'n v. Hope Nat. Gas Co., 320 U.S. 591, 603 (1944), it would be premature to address Plaintiff's claims relating to all AAPS members and Dr. Natuzzi. Although the Court is concerned the Act's IDRP and available state court review may be unreasonably time-consuming and financially burdensome in certain cases, there may be instances in which these provisions provide for a more timely and cost-effective resolution of an AAPS member's dispute with a managed care plan.³ Accordingly, as it currently stands, there are no facts in Plaintiffs' FAC describing how the IDRP and judicial review forecloses the ability of AAPS members and Dr. Natuzzi to obtain adequate compensation for rendered services. Because Plaintiffs have not pleaded sufficient facts showing the Act's IDRP and subsequently available state court review effectively denying physicians reasonable and just compensation for medical services without adequate procedural protections, their Due Process Clause claim is DISMISSED on this basis as well.

///

---

³ By conceding that they are not pursuing facial challenges to the Act, Plaintiffs essentially concede that this may be the case.

**2.    Takings**

Plaintiffs next claim AAPS members and Dr. Natuzzi suffered a taking without just compensation as a result of Defendant's implementation of the Act. More specifically, they contend the Act has "decreased reimbursements for some [services] below their true economic costs, and thus the reduced reimbursements are thereby confiscatory." ECF No. 33, at ¶ 32. According to Plaintiffs, Defendant violated the Takings Clause by denying Plaintiffs "their right to quantum meruit for those services and instead [subjected] them to a cost-prohibitive dispute resolution," which effectively "[transferred] property—the fair market value for services rendered—from out-of-network physicians to health plans that would otherwise be required to pay in full for the services rendered by the physicians." ECF No. 36 at 13–14. Defendant of course disagrees, arguing that Plaintiffs' Takings Clause claim is not ripe for the Court's review because Plaintiffs do not plead any facts showing they participated in the Act's IDRP process or challenged any particular reimbursement amount in state court. Defendant's argument is again more persuasive.

The Fifth Amendment's Takings Clause prohibits the taking of "private property . . . for public use, without just compensation." U.S. Const. amend. V. A Takings Clause claim requires proof that the plaintiff's constitutionally protected property interest has been severely burdened by the government regulation. See Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 538–39 (2005); see also Sierra Med. Servs. All. v. Kent, 883 F.3d 1216, 1223 (9th Cir. 2018) (citing Turnacliff v. Westly, 546 F.3d 1113, 1118 (9th Cir. 2008).

Plaintiffs' only available property interest for purposes of a Takings Clause challenge is a right to obtain "fair and reasonable return" for rendered services. See Fed. Power Comm'n, 320 U.S. at 603; see also, e.g., Huskinson & Brown v. Wolf, 32 Cal. 4th 453, 461 (2004) (describing *quantum meruit* as "the reasonable value" of professional services). Accordingly, the Court must determine whether Plaintiffs have pleaded sufficient facts showing Defendant implemented the Act in a way that deprived

them of fair and reasonable reimbursement rates without just compensation.

The primary hurdle to Plaintiffs' instant cause of action is that the finality requirement for ripeness of a Takings Clause challenge demands Plaintiffs show the implementing agency has arrived at a final and definitive conclusion "regarding the application of the regulations to the property at issue." See Williamson County Regional Planning Com'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 186 (1985). As stated above, Plaintiffs' FAC lacks sufficiently particularized facts demonstrating AAPS members and Dr. Natuzzi were ever denied just compensation under the Act. Merely stating that Dr. Natuzzi has experienced a 25 percent decrease in revenue is far too generalized for this Court to find a regulatory taking claim. Consequently, Plaintiffs' Takings Clause claims are DISMISSED with leave to amend.

### 3. Preemption

Finally, "Plaintiffs assert a cause of action for violation of the Supremacy Clause of the U.S. Constitution, claiming the Act prohibits out-of-network providers from collecting for their services rendered to Medicare beneficiaries." ECF No. 34-1 at 19. Defendant argues in response, however, that "the Act is not, and has never been, applied to Medicare plans." Id. Given the lack of any clear statement of the law going to this point, but with Defendant fervently asserting that Medicare beneficiaries are not implicated, the Court held oral argument and directed the parties to meet and confer to attempt to resolve the question. They did so and timely provided the Court with a supplemental status report in which Defendant provided a guidance letter clarifying that AB 72 does indeed not apply to Medicare beneficiaries. ECF No. 47. Given this policy statement, the Court concludes Plaintiffs' preemption claim is moot, and Defendant's Motion to Dismiss this cause of action is GRANTED as well.

///
///
///
///

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss (ECF No. 34) is GRANTED with one (1) final leave to amend. Not later than thirty (30) days following the date this Memorandum and Order is electronically filed, Plaintiffs may, but are not required to, file an amended complaint. If no amended complaint is timely filed, the causes of action dismissed by virtue of this Memorandum and Order will be deemed dismissed with prejudice and no further notice to the parties.

IT IS SO ORDERED.

Dated: June 13, 2019

MORRISON C. ENGLAND, JR
UNITED STATES DISTRICT JUDGE